# CIRCUIT COURT OF THE CITY OF PORTSMOUTH

David R. Denny

v.

C. Wayne Prince et al.

August 8, 2005

Case No. (Law) 04-1575

BY JUDGE MARK S. DAVIS

This matter is before the Court on defendants' Special Plea to the Subject [Matter] Jurisdiction of the Court. Defendants contend in their special plea that the Court is without subject matter jurisdiction over this controversy and must dismiss plaintiff's suit. The factual and procedural background of this matter, discussion of the issues, and conclusions are set forth below.[1]

---

[1] Plaintiff Denny was represented at the May 13, 2005, hearing by W. Ware Morrison, Esq., of W. Ware Morrison, P.L.L.C., and the defendants were represented by Raymond H. Strople, Esq., of Moody, Strople, Kloeppel, Basilone, & Higginbotham, Inc.

*I. Factual and Procedural Background*

*A. Motion for Judgment*

On August 5, 2004, the plaintiff, David R. Denny, who was formerly employed as Pastor at Cradock Baptist Church from 1992 until 2001, filed his Motion for Judgment against the defendants, who allegedly were associated with the church during the relevant time period. MFJ ¶ 5. Denny asserts that defendants collectively, intentionally, and mutually did undertake and consort together for the purpose of willfully and maliciously injuring him, professionally and personally, and, with knowledge of his contract of employment with the church, intended to interfere with that contract. MFJ ¶ 6. Particularly, Denny contends the finance committee held secret meetings and asserted he had performed improper financial transactions regarding church property. MFJ ¶ 8. Denny also alleges defendants acted contrary to the established church rules and procedures respecting certain actions by various church officials. MFJ ¶¶ 9-11, 13-18. For example, Denny alleges that defendants were required to call a meeting for a vote on his dismissal and that no such meeting was called. MFJ ¶¶ 15-16. Denny claims that when such a vote was ultimately taken, "[m]any members present on that date were not active members of the congregation, though they were allowed to cast a vote." MFJ ¶ 18. Moreover, Denny asserts the defendants made inappropriate, hurtful, and disparaging remarks about and to him. MFJ ¶¶ 12-14, 17-18. Incidentally, while the numerous alleged derogatory statements about Denny are noted in the Motion for Judgment, counsel for the plaintiff assured the Court at the May 13, 2005, hearing that the action asserted against the defendants is not one for defamation, and the Court accepts this statement as a binding admission. Tr. 26-28.

In sum, plaintiff concluded his motion for judgment by stating that "[d]efendants' actions described herein constitute tortious interference with Plaintiff's contract and his expectation of future economic gain." MFJ ¶ 19. As a result, Denny claims he was dismissed from his employment with the church, suffered irreversible damage to his personal and professional reputation, is unable to gain employment in his chosen profession, and has expended substantial monies to compensate for the damage caused by the actions of the defendants. MFJ ¶ 20. He seeks damages in the amount of $500,000.00.

## B. Responsive Pleadings by Defendants

On November 3, 2004, in response to the motion for judgment, the defendants, collectively with the exception of C. Wayne Prince, filed a Motion for Bill of Particulars seeking details of the contract alleged by plaintiff. At the same time, such defendants also filed a Motion Craving *Oyer* of any documents reflecting the contract alleged by plaintiff.[2] On December 16, 2004, the Court entered an order granting both motions, and requiring the defendants to file responsive pleadings within twenty-one days after receipt of the information requested in defendants' motions. In response, plaintiff Denny filed a Bill of Particulars stating: "Dr. Denny had an oral contract with the Church based on the attached documentation."[3] Attached was a July 11, 1992, letter from the Stewardship and Pastor Search Committee Chairpersons providing details of the employment offer the church was prepared to extend and a copy of the Cradock Baptist Church Constitution and By-Laws. Thereafter, on January 20, 2005, the defendants, collectively including all of the named defendants, filed a Demurrer and Motion to Dismiss.

## C. May 13, 2005, Hearing

The parties argued the issues presented in the Demurrer and Motion to Dismiss at a hearing on May 13, 2005. At that hearing, the Court, *sua sponte*, raised the issue of subject matter jurisdiction.[4] At the conclusion of the hearing, counsel for the defendants requested that the Court dismiss

---

[2] A motion craving *oyer* is a request that the court order an adversary to "produce a governing instrument for incorporation with the pleadings." Kent Sinclair and Leigh B. Middleditch, Jr., *Virginia Civil Procedure*, § 9.6 (4th ed. 2003).

[3] Counsel for Denny conceded at the May 13, 2005, hearing that Denny "was employed with a terminable at will contract with Cradock Baptist Church." Tr. p. 17.

[4] It is a well settled legal principle that subject matter jurisdiction may be raised at any time during a proceeding, even at the appellate stage, and may be done by any party to the action, or by the Court, *sua sponte*. *Earley v. Landsidle*, 257 Va. 365, 371 (1999) ("lack of subject matter jurisdiction may be raised at any time during a proceeding, even by this Court *sua sponte*"). Moreover, the United States Supreme Court has classified the several federal courts' *sua sponte* power to consider subject matter jurisdiction as a duty or obligation, rather than as a mere convenience of judicial power. *Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567, 593 (2004) ("by whatever route a case arrives in federal court, it is the obligation of both district court and counsel to be alert to jurisdictional requirements"). The same is true for cases arriving in state court.

the case because civil courts do not normally decide issues involving ecclesiastical law. Hearing Transcript, p. 32.

## D. Special Plea to the Subject [Matter] Jurisdiction of the Court

After the May 13, 2005, hearing, the defendants followed up on their oral request for dismissal based upon lack of subject matter jurisdiction by filing a Special Plea to the Subject [Matter] Jurisdiction of the Court. In their special plea, defendants argue that the Court is without subject matter jurisdiction to consider the present case. Relying upon the Virginia Supreme Court's Opinion in *Jae-Woo Cha v. Korean Presbyterian Church of Washington*, 262 Va. 604 (2001), *cert. denied*, 535 U.S. 1035 (2002), defendants argue that "[s]ince the resolution of Plaintiff Denny's claim would require the Court to adjudicate issues regarding the church's governance and internal organization and doctrine and judicial intervention would limit the church's right to select its religious leaders, the Court has no jurisdiction of the subject matter in this cause."

## II. Applicable Law

We begin our examination of the question by looking to the sources of this Court's authority. As a Court of the Commonwealth of Virginia, this Court is subject to the limits placed upon its power by the Constitution of Virginia. Because persons appearing in the courts of the Commonwealth of Virginia are also entitled to the protections afforded by the Constitution of the United States of America, this Court must also examine the limits placed upon its power in certain areas by that Constitution. The Court will therefore consider those constitutions and case law applying their provisions. However, before doing so, the Court must determine the applicable standard for considering these issues.

## A. Standard for Consideration

This matter originally came before the Court on a demurrer and motion to dismiss. The defendants craved *oyer* of various documents and such documents are currently before this Court for consideration in making its determination. However, as noted above, after the May 13, 2005, hearing, defendants filed a Special Plea to the Subject Matter Jurisdiction of the Court. While evidence may be taken on a dispositive plea such as this special plea, all of the relevant documents applicable to

the special plea were submitted by the parties at the demurrer hearing and are before the Court because defendants craved *oyer* of such documents. Therefore, whether the Court examines those documents in the context of the demurrer or the special plea, it is still entitled to make such examination. The Court also notes that plaintiff has not responded to defendants' Special Plea of May 16, 2005, and therefore assumes that plaintiff does not wish to present any additional argument or evidence.

A plea in bar is a defensive pleading that reduces the litigation to a single issue, which, if proven, creates a bar to the plaintiff's right of recovery. *Cooper Industries v. Melendez*, 260 Va. 578, 594 (2000). While the party asserting the special plea bears the burden of establishing the defense, *Id.*, it must be remembered that it is ultimately the plaintiff's burden to establish this Court's jurisdiction. *Turner v. Bank of North America*, 4 U.S. 8 (1799), *see Richmond, Fredericksburg & Potomac RR. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). Where no evidence is taken on a special plea, the trial court considers solely the pleadings in resolving the issue, and the facts stated in the plaintiff's motion for judgment are deemed true. *Lostrangio v. Laingford*, 261 Va. 495, 497 (2001). The Court may also consider items contained in a bill of particulars, such as that filed in this case. *Whitley v. Commonwealth*, 260 Va. 482, 493 (2000). Where factual allegations in plaintiff's motion for judgment are contradicted by the terms of authentic, unambiguous documents that are part of the pleadings, the Court may disregard the contradictory factual allegations and rely upon the documents. *See McMillion v. Dryvit Systems, Inc.*, 262 Va. 463, 469 (2001) (applying rule in a demurrer context versus special plea context).

The Court also noted that there is no need to conduct a constitutional balancing test to determine to what extend judicial scrutiny of Denny's claims would offend defendants' religious freedoms, as the Court might have done if it were reviewing a statute that burdened their religious freedoms. *See Williams v. Episcopal Diocese of Mass.*, 436 Mass. 574, 580-81, 766 N.E.2d 820, 825 (2002) (citing *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971), and *Sherbert v. Verner*, 374 U.S. 398, 407 (1963)). As the *Williams* court concluded, the "application of First Amendment principles, in circumstances such as these, involves no balancing test" since the question is whether "adjudication of the plaintiff's claims would implicate matters of ecclesiastical relationships. . . ." *Williams*, 436 Mass. at 580-81, 766 N.E.2d at 825.

## B. Constitutional Authority

Looking to the state and federal constitutions that form the social compacts under which we live, the Court must determine whether judicial examination and resolution of plaintiff's allegations would violate the First Amendment to the United States Constitution, and Article I, § 16, of the Constitution of Virginia. If such examination would violate those provisions, this Court has no subject matter jurisdiction in the case and must order its dismissal. In relevant portions, the First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."[5] The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law. . . ." The "fundamental concept of liberty embodied in that [fourteenth] amendment embraces the liberties guaranteed by the First Amendment." *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). Accordingly, the First Amendment to the United States Constitution is applied against the states through the Fourteenth Amendment. *Elk Grove Unified Sch. Dist. v. Newdow*, 124 S. Ct. 2301, 2307 (2004). Article I, § 16, of the Constitution of Virginia states "religion or the duty which we owe to our Creator, and the manner of discharging it, can be directed only by reason and conviction, not by force or violence; and, therefore, all men are equally entitled to the free exercise of religion, according to the dictates of conscience." Article I, § 16, of the Virginia Constitution is a parallel provision to the Establishment Clause in the First Amendment to the United States Constitution, and the Virginia Supreme Court has "always been informed by the United States Supreme Court Establishment Clause jurisprudence in [their] construction of Article I, § 16. *Virginia College Bldg. Auth. v. Lynn*, 260 Va. 608, 626 (2000). These are the provisions of our constitutions that must be applied to the present dispute.

Before we begin review of the case law in this area, it is helpful to understand the purpose underlying these religion clauses. The United States Supreme Court "has explained that the purpose of the Establishment and Free Exercise Clauses of the First Amendment is 'to prevent, as far as possible, the intrusion of either [the church or the state] into the precincts of the other.' *Lemon v. Kurtzman*, 403 U.S. 602, 614

---

[5] The first clause of this sentence is referred to as the Establishment Clause, while the second is referred to as the Free Exercise Clause.

(1971)." *Lynch v. Donnelly*, 465 U.S. 668, 672 (1984). "At the same time, however, the Court has recognized that 'total separation is not possible in an absolute sense. Some relationships between government and religious organizations is inevitable'." *Lynch*, 465 U.S. at 672.

## C. Overview and Historical Development

If asked to envision a violation of the religion clauses cited above from the Constitution of the United States or the Constitution of Virginia, "one is likely to focus on the outward actions of the government that affect or involve religious individuals or institutions – the distribution of funds to religious schools, for example, or the criminalization of peyote use, or the restrictive zoning of church property." Scott C. Idleman, *Tort Liability, Religious Entities, and the Decline of Constitutional Protection*, 75 Ind. L.J. 219, 220 (2000). This may be the result of the prohibitory language in the First Amendment, mandating that "Congress shall make no law," or because of the usual context in which these issues arise. However, according to United States Supreme Court precedent, "the religion clauses also contain a more abstract restriction on the capacity of government, and especially the judiciary, to involve itself in matters of religious truth and doctrine, potentially irrespective of the conduct at issue and the identities of the parties." Idleman, *supra*. "Broadly conceptualized, this restriction amounts to a general prohibition on the adjudication of religious questions, not unlike the Article III prohibition [in the United States Constitution] on the adjudication of so-called political or nonjusticiable questions." Idleman, *supra*. This restriction on adjudication is rooted in the religion clauses referred to above, though some courts rely exclusively upon the Free Exercise clause, some exclusively upon the Establishment clause, and some on both. Idleman, *supra* at 222. The Virginia Supreme Court has relied upon the Free Exercise clause in applying the restriction on adjudication. *Cha*, 262 Va. at 611. Furthermore, a majority of courts broadly conceptualize the restriction on adjudication as a bar on jurisdiction, while some employ the concept of nonjusticiability, others abstention, and others apply an evidentiary rule to bar adjudication. Idleman, *supra* at 225-27. The Virginia Supreme Court treats the restriction as a bar on jurisdiction.[6] *Cha*, 262 Va.

---

[6] Before any court may adjudicate a dispute, it must determine whether the subject matter of the dispute is the type of subject matter about which the court should render a decision – also known as potential jurisdiction. In making this determination, it is frequently said that the court must determine whether it has jurisdiction over the subject matter of the suit.

at 612. In order to understand and apply this restriction on adjudication, we must examine the controlling precedent outlined below.

As a preliminary matter, it is important to understand the two primary forms of church governance discussed in the cases analyzing these principles. The types of church polity may be characterized as either congregational or hierarchical. Hierarchical churches include "super congregational" and "connectional churches," and they frequently exercise authority through laymen and ministers organized in an ascending succession of judicatories. *See Emberry v. Bloomington District,* 482 N.E.2d 288, 293 (Ind. 1985). "They may, and frequently do, establish internal tribunals to decide internal disputes arising in matters of discipline and internal government." *Reid v. Gholson,* 229 Va. 179, 188-89 (1985), *cert. denied,* 474 U.S. 824 (1985). Such tribunals are frequently guided by internally-developed canon or ecclesiastical law and decisions of such tribunals are entirely independent of civil authority. *Id.* "One who becomes a member of such a church, by subscribing to its discipline and beliefs, accepts its internal rules and the decision of its tribunals," and "[f]or that reason, the civil courts will treat a decision by a governing body or internal tribunal of an hierarchical church as an ecclesiastical determination constitutionally immune from judicial review." *Id.* "Congregational churches, on the other hand, are governed by the will of the majority" and "are free to adopt constitutions, by-laws, and internal rules which will alter or regulate their proceedings, but even these must be enacted by a majority vote." *Id.* "[I]n the absence of such voluntarily-adopted rules, each such congregation functions as a pure democracy." *Id.* Some courts also recognize a hybrid church polity combining these two types of polity. *Werling v. Grace,* 139 Ill. App. 3d 496, 499, 487 N.E.2d 990, 992 (1985). We now examine the binding case precedent informing the Court's decision.

---

"Unlike jurisdiction over the person or thing, subject matter jurisdiction is not nearly so much an external justificatory concept. It is rather a device to assure that the court before which a case comes is the appropriate court to hear *that type of case.*" In asking this question, a court is essentially asking whether it is competent to hear the subject matter of the dispute. In making this determination, a court must look to the constitution or legislation that created the court, as well as controlling and/or persuasive precedent. Robert Brousseau, *Civil Procedure,* § 4.01 (1982); *Thacker v. Hubard & Appleby,* 122 Va. 379 (1918) ("[b]y jurisdiction over the subject matter is meant the nature of the cause of action and of the relief sought; and this is conferred by the sovereign authority which organized the court, and is to be sought for in the general nature of its powers, or in authority especially conferred"); *see United States v. Mine Workers,* 330 U.S. 258, 290 (1947) (a court always has jurisdiction to determine its jurisdiction).

### 1. *Watson*

The United States Supreme Court first considered the issue of judicial involvement in church disputes in *Watson v. Jones*, 80 U.S. (13 Wall.) 679 (1871), where the Court (with its jurisdiction grounded on diversity of citizenship) was asked to decide which of two competing groups had control over church property. The case is widely recognized as the cornerstone for the principle that judicial authorities should not intervene in church affairs. As Professor Erwin Chemerinsky noted, "[a]lthough the Court decided on non-constitutional grounds, its analysis has been invoked in subsequent First Amendment decisions" holding that the judiciary should not intervene in church disputes. Erwin Chemerinsky, *Constitutional Law Principles and Policies*, p. 1218 (2d ed. 2003).

Commenting on the decisions of hierarchical churches, the *Watson* Court concluded as follows:

> [W]henever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them.

*Id.* at 727. Moreover, the Court opined:

> In this country the full and free right to entertain any religious belief, to practice any religious principle and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their

decisions could appeal to the secular courts and have them reversed. It is the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for.

*Id.* at 728-29. In addition to the implied consent rationale for allowing ecclesiastical decisions to bind hierarchical church adherents, the Court also questioned the competence of the judiciary to remedy such disputes, noting:

It is not to be supposed that the judges of the civil courts can be as competent in the ecclesiastical law and religious faith of all these bodies as the ablest men in each are in reference to their own. It would therefore be an appeal from the more learned tribunal in the law which should decide the case, to one which is less so.

*Id.* at 729.

### 2. Bouldin

In *Bouldin v. Alexander*, 82 U.S. (15 Wall.) 131 (1872), the Supreme Court heard an appeal from the Supreme Court of the District of Columbia involving a church dispute arising in the District of Columbia. The Court found that, under certain circumstances, a civil court can declare who may control the property of an independent congregational church. A minority of the congregation had met and expelled the majority of the members and the trustees in whom title was formally vested. Though not clearly relying on First Amendment principles, the Supreme Court found that civil courts must follow the will of the majority of such a congregational church in order to decide who had legal title to property, stating that "[i]n a congregational church, the majority, if they adhere to the organization and to the doctrines, represent the church." *Id.* at 140.

### 3. Gonzalez

In 1929, the United States Supreme Court again considered an ecclesiastical dispute, concerning whether "the petitioner [wa]s legally entitled to be appointed the chaplain and whether he sh[ould] recover the surplus income accrued during the [chaplaincy's] vacancy." *Gonzalez v.*

*Roman Catholic Archbishop of Manila*, 280 U.S. 1, 10 (1929). The Supreme Court refused to allow a civil court to determine the qualification of a chaplain of the Roman Catholic Church, where a testatrix gave funds to the church to establish a chaplaincy to which her nearest male relative was to be appointed whenever possible. One of her descendants sought the post but was refused appointment by the church due to his lack of qualification under ecclesiastical law. In what has since been described as *dictum, see Serbian Eastern Orthodox Diocese for the U.S. and Canada v. Milivojevich*, 426 U.S. 696, 712 (1976), the Supreme Court observed that, "[i]n the absence of fraud, collusion, or arbitrariness, the decisions of the proper church tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as conclusive, because the parties in interest made them so by contract or otherwise." *Id.* at 16. Since this 1929 decision, Courts in the United States have struggled to apply this "fraud, collusion, or arbitrariness" exception to the ideal of judicial deference.

### 4. Kedroff

As both *Watson* and *Gonzalez* did not construe the First Amendment to the United States Constitution, but rather were essentially decided on non-Constitutional grounds, the Court in *Kedroff v. Saint Nicholas Cathedral of the Russian Orthodox Church in North America*, 344 U.S. 94, 115-16 (1952), elevated its judicial deference rationale to constitutional status. In that case, the Court declared unconstitutional a state law that granted ownership of church property to the American branch of the Russian Orthodox Church. The Court held that the state law violated the free exercise clause by interfering with an internal church dispute and deciding who was the "true" church. After the decision, the New York courts held that the American-controlled faction of the Russian church was entitled to the property even though the statute had been held invalid. The Supreme Court reversed the decision of the New York court, holding that civil courts must defer to the ecclesiastical authorities and that there could be no judicial review of those decisions, regardless of whether the review was based on statute or common law. *Kreshik v. St. Nicholas Cathedral*, 363 U.S. 190 (1960). Although *Kedroff* was decided in the context of reviewing a state law impacting religion, it provided the constitutional nexus between the trio of *Watson/Bouldin/Gonzalez* and subsequent judicial deference decisions.

### 5. Hull Church

In *Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Church*, 393 U.S. 440, 443-44 (1969), the Court was asked to resolve a property dispute when two local churches attempted to withdraw from a national Presbyterian Church organization. The concept of applying "neutral principles" of secular law in church property disputes, in order to determine the rightful owner of church property, was first introduced in this case. When the matter was tried before the jury in the Georgia trial court, the court instructed the jury that it was:

> [T]o determine whether the actions of the general church "amount to a fundamental or substantial abandonment of the original tenets and doctrines of the general church, so that the new tenets and doctrines are utterly variant from the purposes for which the general church was founded."

In reversing the Georgia court, the U.S. Supreme Court alluded to neutral principles of secular law that could be applied in resolving certain church property disputes, stating:

> Thus, the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes. It is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are *neutral principles of law*, developed for use in all property disputes, which can be applied without "establishing" churches to which property is awarded. But First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice.

*Id.* at 449 (emphasis added). Thus, while the Court held that no inquiry could be made on these facts as to whether the general church had deviated from its doctrine, the Court also hinted at an alternative to judicial deference in church property disputes, noting that neutral principles of law could be employed.

## 6. Milivojevich

In *Serbian Eastern Orthodox Diocese for the U.S. and Canada v. Milivojevich*, 426 U.S. 696 (1976), the Court was asked to review the decision of a religion to defrock and remove one of its bishops. The Court reversed a state court decision resolving the dispute, noting that the state court ruling "rests upon an impermissible rejection of the decisions of the highest ecclesiastical tribunals of this hierarchical church upon the issues in dispute, and impermissibly substitutes its own inquiry into church polity." *Id.* at 708. The Court expressed its concern that a Court not venture so far into the resolution of an ecclesiastical dispute, as to become entangled, thereby violating the First Amendment. *Id.* at 709. Thereafter, the Court reviewed the holdings of *Watson* and *Gonzalez* before proceeding to explain the limited exception announced in *Gonzalez*. *Id.* at 710-12. The Court concluded:

> Thus, although *Watson* had left civil courts no role to play in reviewing ecclesiastical decisions during the course of resolving church property disputes, *Gonzalez* first adverted to the possibility of "marginal civil court review" in cases challenging decisions of ecclesiastical tribunals as products of "fraud, collusion, or arbitrariness." However, since there was "not even a suggestion that the Archbishop exercised his authority in making the chaplaincy decision arbitrarily, the suggested "fraud, collusion, or arbitrariness" exception to the *Watson* rule was *dictum* only. And although references to the suggested exception appear in opinions in cases decided since the *Watson* rule has been held to be mandated by the First Amendment, no decision of this Court has given concrete content to or applied the "exception." . . . We have concluded that, whether or not there is room for "marginal civil court review" under the narrow rubrics of "fraud" or "collusion" when church tribunals act in bad faith for secular purposes, no "arbitrariness" exception – in the sense of an inquiry whether the decisions of the highest ecclesiastical tribunal of a hierarchical church complied with church laws and regulations – is consistent with the constitutional mandate that civil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of

discipline, faith, internal organization, or ecclesiastical rule, custom, or law.

*Id.* at 712-13. Notably, the Court did not endorse limited review in cases of "fraud" or "collusion," but rather simply dismissed "arbitrariness" as an exception, and left open the question of whether civil court review was appropriate where fraud or collusion was alleged. *See Hutchinson v. Thomas*, 789 F.2d 392, 395 (6th Cir. 1986), *cert. denied*, 479 U.S. 885. The *Milivojevich* Court noted its prior observation that civil courts are not competent to consider ecclesiastical decisions and concluded that the fact that distinguishes religious-based disputes from civil disputes is not that the body of knowledge is distinct, but rather that the inquiry is guided by different analytical principles. The Court commented:

Indeed, it is the essence of religious faith that ecclesiastical decisions are reached and are to be accepted as matters of faith whether or not rational or measurable by objective criteria. Constitutional concepts of due process, involving secular notions of "fundamental fairness" or impermissible objectives, are therefore hardly relevant to such matters of ecclesiastical cognizance.

*Id.* at 714-15.

Justices Rehnquist and Stevens took a different view of Supreme Court precedent, noting that *Watson, Bouldin,* and *Gonzalez* had no direct relevance to the issue then before the Court, which was "whether the First Amendment, as made applicable to the States by the Fourteenth, prohibits Illinois from permitting its civil courts to settle religious property disputes in the manner presented to us on this record." *Milivojevich*, 426 U.S. at 732-33. While recognizing that these earlier decisions were not constitutional in nature and merely recognized the limited role which civil courts must have in settling private intraorganizational disputes, the dissent contended that, beginning with *Kedroff* and subsequent precedent, the Court had concluded "that the government may not displace the free religious choices of its citizens by placing its weight behind a particular religious belief, tenet, or sect." The dissent then concluded that the Illinois courts had merely applied neutral principles of law to resolve the dispute with which it was presented. In rejecting the petitioners' request that the Court defer entirely to the announced representatives of the "Mother Church," the dissenting Justices concluded that making "available the

coercive powers of civil courts to rubber-stamp ecclesiastical decisions of hierarchical religious associations, when such deference is not accorded similar acts of secular voluntary associations, would, in avoiding the free exercise problems petitioners envision, itself create far more serious problems under the Establishment Clause." *Id.* The dissent concluded that, "while there may be a number of good arguments that civil courts of a State should, as a matter of the wisest use of their authority, avoid adjudicating religious disputes to the maximum extent possible, they obviously cannot avoid all such adjudications," and while common-law principles like those discussed in *Watson, Bouldin,* and *Gonzalez* may offer some sound principles for those occasions when such adjudications are required, they are certainly not rules to which state courts are required to adhere by virtue of the Fourteenth Amendment," since such Amendment merely requires the application of neutral principles of law, as done by the Illinois court. *Id.* at 734-35.

### 7. Jones

Ten years later, in another case from Georgia, the United States Supreme Court considered "whether civil courts, consistent with the First and Fourteenth Amendments to the Constitution, may resolve the dispute [over church property following a church schism] on the basis of 'neutral principles of law,' or whether they must defer to the resolution of an authoritative tribunal of the hierarchical church." *Jones v. Wolf,* 443 U.S. 595, 597 (1979). In *Jones,* the Court approved of the "neutral principles" approach in deciding church property disputes, so long as its application does not "involve[] consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith." *Id.* at 602. The Court did not, however, go so far as to require this approach, but merely concluded, "the First Amendment does not dictate that a State must follow a particular method of resolving church property disputes," so long as the sphere of religious authority is not violated. *Id.* In applying neutral principles, the Court conceded that consideration of certain church documents, such as the church constitution, could necessarily involve the consideration of church doctrine, about which the court must defer to the highest church authority. *Id.* at 604. Lastly, the Court clarified the proper scope of this line of cases, and of the emergent neutral principles analysis, holding "that a State is constitutionally entitled to adopt neutral principles of law as a means of adjudicating a church property dispute." *Id.* The U.S. Supreme Court has not taken up these issues again since this *Jones* decision in 1979.

The U.S. Supreme Court denied *certiorari* in *Little v. First Baptist Church, Crestwood*, 475 U.S. 1148 (1986). However, Justices Marshall and Brennan issued a dissent from the denial of *certiorari*. In that case, a Virginia circuit court appointed a commissioner to oversee a church election to determine whether the pastor of a congregational church was entitled to continue in that office. Justices Marshall and Brennan contended that, in a congregational church context, "[a] court may apply neutral principles of secular law to the dispute at hand. When that process requires a court to determine the validity of a church decision, the court ordinarily must discern from the relevant canonical law what body is authorized to make a particular decision within the church, and what decision that body has reached." Once those determinations have been made, "the court may not inquire whether the decision was made arbitrarily or whether it conflicts with the ecclesiastical precepts of the organization." *Id.* at 1149. Finally, they concluded that the "court in this case should have limited its inquiry to the terms of petitioner's employment contract and to whether the Church had taken the actions requisite to terminating that contract." *Id.* at 1150.

## 8. Virginia Precedent

In *Reid*, 229 Va. 179, the Supreme Court of Virginia examined a "protracted and complex dispute between two factions in the membership of a congregational church." The church had no written constitution or by-laws and was traditionally governed by majority vote at annual congregational meetings. One faction proposed adoption of a constitution and by-laws that defined how control over church property would be determined. That faction then mailed letters to the other faction notifying them that they were not eligible to vote at the meeting where a vote would be taken on adoption of the constitution and by-laws. The circuit court granted the dissenters' request to appoint a special commissioner to run and oversee the proposed congregational meeting. *Id.* at 181-84. The circuit court found that, at the proposed congregational meeting, the members would be called on to decide the *control of property*, that the court was not required to resolve any ecclesiastical issues, and that the civil and property rights in dispute *could be resolved by the use of neutral principles of law* without violating the First Amendment. *Id.* at 184. After repeatedly ignoring the efforts of the circuit court to address the dispute, the dissenters appealed the circuit court's denial of their petition to enjoin the special commissioner from interfering in the congregational meeting.

The Virginia Supreme Court noted that the question before it was whether the Court could decide the case by reference to neutral principles of law, without reference to issues of faith or doctrine. After examining the distinctions between hierarchical and congregational churches (as reviewed above) and the absence of an appeal mechanism in a congregational church, the Court noted that there was no contention that there exists any doctrinal dispute among the contending factions. The Court said members of the church were merely seeking the protection of the court for the purpose of obtaining a *fairly-conducted meeting*. The Court concluded that a "member of a congregational church, seeking the aid of the court in protecting his civil property rights, may appeal only to the simple and fundamental principles of democratic government which are universally accepted in our society." *Id.* at 189. The Court went on to recognize that such principles included the right to reasonable notice, the right to attend and to advocate, and the right to an honest count of the votes, rights which are fundamental to our notions of due process and which are neutral principles of law applicable to all citizens. The Court then noted that "the authorities which preclude the courts from examining whether an hierarchical church correctly followed its own internal procedures, or correctly applied its canon law, are inapposite to the question before us." *Id.* at 190.

In *Cha*, 262 Va. at 607, the Virginia Supreme Court "consider[ed] whether the First Amendment to the Constitution of the United States and Article I, § 16, of the Constitution of Virginia prohibit the circuit court from resolving a former pastor's claims against a church and certain defendants who were involved in the church's governance." As one of his claims, *Cha* asserted "that certain defendants tortiously interfered with his contract of employment with the church," just as alleged here. *Id.* In detailing its analysis, the Court cited many of the opinions discussed above, and additionally noted: "[t]he constitutional guarantees of religious freedom have no deeper roots than in Virginia, where they originated, and nowhere have they been more scrupulously observed. These principles prohibit the civil courts from resolving ecclesiastical disputes which depend upon inquiry into questions of faith or doctrine." *Id.* at 611. The Court noted the principle that extraordinary deference is afforded to church leadership decisions regarding ministers. *Id.* at 611-12. Thereafter, the Court assessed plaintiff's tortious interference with contract claim, stating:

Assuming that the plaintiff had an at-will employment contract with the Korean Presbyterian Church, he was required to establish:

(1) the existence of a valid contractual relationship or business expectancy;

(2) knowledge of the relationship or expectancy on the part of the interferor;

(3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and

(4) resultant damage to the party whose relationship or expectancy has been disrupted.

*Id.* at 613. Finally, the Court held:

Without question, had the circuit court exercised subject matter jurisdiction of the plaintiff's motion for judgment, the court would have become entangled in issues regarding the church's governance as well as matters of faith and doctrine. And, as we have already held, ecclesiastical decisions regarding the appointment and removal of pastors are generally beyond the jurisdiction of secular courts. Neither the federal Free Exercise Clause nor Article I, § 16, of the Constitution of Virginia permits a circuit court to decide whether the plaintiff had a valid contractual relationship or business expectancy to serve as a pastor of the Korean Presbyterian Church.

*Id.* The Court alternatively observed:

[E]ven if the plaintiff were able to prove that he had a contract terminable solely for cause with the church, the circuit court would have lacked subject matter jurisdiction to consider his claim because the court could not adjudicate such claim without considering issues regarding the church's governance, faith, and doctrine.

*Id.* at 613, n. 1. These federal and state holdings provide the decisional framework for our analysis.

## III. Discussion

With these principles in mind, we turn to the facts of this case. The first question is whether, on these facts, there are potential exceptions to the principle that civil courts should not generally involve themselves in disputes touching religious organizations. The Court has reviewed above the possibility that there remains an exception to this principle where fraud and collusion are alleged and neutral principles of secular law can be applied to adjudicate the dispute. Furthermore, even if the fraud and collusion exceptions do not apply, where neutral principles of secular law can be applied to resolve the dispute, an additional exception permits civil court adjudication in certain jurisdictions. Assuming that plaintiff's motion for judgment asserts collusion, we will examine the potential fraud and collusion exception first.

## A. Fraud and Collusion

In their text on constitutional law, Professors Nowak, Rotunda, and Young comment as follows on the applications of any potential fraud and collusion exception:

> It must be remembered that civil courts can never question a church's rulings on matter of religious doctrine or even authority. When a church is truly local or congregational, the will of a majority controls the decision. Once it is found that a group has submitted itself and its property to the control of a hierarchical church, the rulings of the highest formal authority in that church must be accepted by the civil courts. There is the possibility that the Supreme Court may allow a further inquiry into whether the general church has replaced local authority over the property for the reasons of "fraud or collusiveness." However, if such an inquiry can be made at all, the civil court could only prevent a clear theft of local church property for the personal benefit of members of the hierarchical organization. [But], [t]he Court has made it clear that the hierarchical authority cannot have its decisions overturned because they are "arbitrary" or contrary to the church's own rules.

John E. Nowak, Ronald D. Rotunda, J. Nelson Young, *Constitutional Law*, p. 1075 (2d ed. 1983). There is strong evidence for the implicit recognition

in this statement that the fraud and collusion exception, if it exists, applies only to disputes involving hierarchical churches. It is understandable that, if the Supreme Court was going to defer to decisions of the highest tribunals in hierarchical churches, it might want to carve out an area of protection in case such tribunals acted fraudulently or collusively under extraordinary circumstances. Furthermore, although some courts seem to have held out the possibility that the fraud and collusion exception could apply in a congregational church context, *Heard v. Johnson*, 810 A.2d 871, 881-82 (D.C. 2002), Virginia Supreme Court precedent appears to have foreclosed that possibility in Virginia.

In *Reid*, the Virginia Supreme Court recognized that neutral principles could apply to permit protection against alleged procedural irregularities in a congregational church context. *Reid*, 229 Va. at 189-90. The fact that the Virginia Supreme Court would permit such review of procedural irregularities suggests the absence of any need for a Virginia fraud or collusion exception in the congregational church context. Therefore, based upon the discussion of cases above, this Court concludes that the limited potential for application of the fraud and collusion exceptions referenced in *Milivojevich* is foreclosed in Virginia courts addressing congregational church disputes.

The *Heard* Court may have been willing to consider the possibility of a fraud or collusion exception applying in a congregational context because it concluded, in deciding whether to defer to decisions of a congregational church body in the same way that *Milivojevich* required courts to defer to decisions of hierarchical church tribunals, that "a congregational church's internal organization provides no nuance that would change its standing under the First Amendment or that would require a different constitutional analysis from that afforded to a hierarchical church." *Heard*, 810 A.2d at 879, n. 4 (collecting similar cases). *However*, the Virginia Supreme Court appears to have taken the opposite position, as noted above, when it concluded that in the congregational context it did not have to defer to the decisions of the congregational church on matters of internal organization where neutral principles of law can be applied. *Reid*, 229 Va. at 190. Therefore, it is understandable that, if a court, such as the *Heard* court, were going to generally defer to decisions of the church body on its internal organization, it might want to leave open the possibility of civil court review in case extraordinary circumstances of fraud or collusion presented themselves; whereas a court that would not defer to decisions of congregational churches on internal organization when presented with an

ongoing factional dispute, such as the *Reid* court, might not want to leave open the avenue of a fraud or collusion exception since it was going to apply neutral principles and review the decision regarding internal organization anyway.

Even if the fraud and collusion exceptions did apply to this dispute, as in *Heard*, "there are no extraordinary circumstances here that would warrant an application of a possible exception to First Amendment protections for church decisions." *Heard*, 810 A.2d at 881. This is particularly so where the matter is before the Court on a tort claim four years after the fact, versus having an imminent factional congregational meeting facing a court where property issues will be decided.

Furthermore, even if this Court were inclined to "rush in where the Supreme Court has refused to tread, [Denny] has made no showing that the exception should be applied here." *Id.* As noted above, when considering a special plea where no evidence has been presented, this Court considers solely the pleadings and any documents made a part of the pleadings pursuant to the Court's order granting the motion craving *oyer*. As the *Heard* court noted, "[i]n discussing the possibility of a 'fraud or collusion' exception, the Supreme Court noted that it would only apply when a 'church tribunal [] act[s] in bad faith for secular purposes'." *Id.* In Denny's motion for judgment, he never asserts that the defendants acted for secular purposes. As the *Heard* Court also noted, "[w]hen the First Amendment casts a shadow over the court's subject matter jurisdiction, the plaintiff is obliged to plead unqualified jurisdictional facts that clearly take the case outside the constitutional bar." *Id.* (citing *Bible Way Church of Our Lord Jesus Christ of the Apostolic Faith v. Beards*, 680 A.2d 419, 430 (D.C. 1996), and *Letica Corp. v. Sweetheart Cup Corp.*, 790 F. Supp. 702, 706 (E.D. Mich. 1992)). This Court agrees, and applies that same standard in this case. Therefore, even if the fraud and collusion exceptions were viable in Virginia, Denny must plead unqualified jurisdictional facts asserting that defendants acted in bad faith for secular purposes. He has not done so. Therefore, Denny has pleaded no facts that would take this case outside the First Amendment's strictures on this Court's jurisdiction under a theory of fraud or collusion. If there is any question about that, one need only look to other cases discussing this requirement that plaintiff must plead that the church tribunal acted in bad faith for secular purposes. While these decisions rest in part on the ministerial exception discussed below, they also recognize the requirement that a plaintiff assert that a church tribunal acted in bad faith for secular purposes. For example, in *Kaufmann v. Sheehan*, 707 F.2d 355, 355-56 (8th Cir. 1983), a Roman

Catholic priest sought to amend his complaint in order to allege that church officials violated canon law by depriving him of a due process hearing before a church tribunal. In considering this allegation that the church failed to follow its own procedures, the *Kaufmann* court concluded that, "[b]ecause his due process arguments deal solely with procedures established by church authority, we believe that we here deal with questions of ecclesiastical due process and that such questions must be left to church authorities."[7] In reference to whether Kaufmann's claims constituted actions sufficient to justify the potential "fraud" or "collusion" exceptions, the court denied the existence of a secular purpose to the alleged bad acts, stating:

> In the instant case, however, Kaufmann's claims relate to his status and employment as a priest, and possibly to other matters of concern with the church and its hierarchy, and go to the heart of internal church discipline, faith, and church organization, all involved with ecclesiastical rule, custom, and law. While there may be some secular aspects to employment and conceivably even to the priesthood or clergy, it is apparent that the priest or other member of the clergy occupies a particularly sensitive role in any church organization. Significant responsibility in matters of the faith and direct contact with members of the church body with respect to matters of the faith and exercise of religion characterize such positions. In spite of Kaufmann's argument, the proposed amendments to the complaint deal only with matters of religion and there is no allegation that we can construe in any other light. Accordingly, we do not here deal with secular purposes and the "fraud" or "collusion" exceptions are unavailable. *Milivojevich* and its underlying rationale prevent this court from deciding what are inherently religious issues. These issues should be left to church authorities for final determination.

*Id.* at 358-59.

---

[7] The *Kaufman* facts present a situation analogous to the hypothetical of the *Milivojevich* dissenters, who had argued that, where civil courts are presented with a neutral principles question, they should not be "bound by any sheet of parchment bearing the ecclesiastical seal and purporting to be a decree of a church court," because doing so would convert such courts into "handmaidens of arbitrary lawlessness." *Milivojevich*, 426 U.S. at 728.

In *Hafner v. Lutheran Church Missouri Synod*, 616 F. Supp. 735, 738 (N.D. Ind. 1985), a priest alleged that the church was required by its constitution to care and provide for him when he became ill and that it failed to do so. In considering the priest's allegations and whether it had subject matter jurisdiction, the court quoted the above language from *Kaufmann*, approving of its analysis of the requirement that a secular purpose be shown regarding the possible exceptions to judicial deference. It also commented upon the sanctity of the church's relationship with its ministers, holding:

> The relationship between an organized church and its minister is its life blood. The minister is the chief instrument by which the church seeks to fulfill its purpose. Matters touching this relationship must necessarily be recognized as of prime ecclesiastical concern. The initial function of selecting a minister is a matter of church administration and government. So are the functions which accompany retention and retirement.

*Id.* at 739.

In another case against the same synod of the Lutheran Church, *Knuth v. Lutheran Church Missouri Synod*, 643 F. Supp. 444, 448 (D. Kan. 1986), the plaintiff asserted, "the only issue in this case is 'whether or not the plaintiff suffered violations of his contractual rights by the fraud, collusion, conspiracy, and arbitrary actions of the [defendants]'." That Court also affirmed the secular purpose requirement of *Milivojevich*, stating:

> The alleged acts of defendants are undeniably matters of church administration which do not serve a secular purpose. Any decision regarding plaintiff's rights to be on the clergy roster would necessarily compel this court to construe ecclesiastical doctrine and to sit in review of the highest church bodies on decisions essentially religious in nature.

*Id.* at 449. The court further remarked that the greatest measure of judicial restraint was owed in situations involving the relationship between a church and its religious leader.

These representative federal court decisions reflect an apparent consensus that, in order to make out claims sufficient to confer subject matter jurisdiction pursuant to the "fraud" and "collusion" exceptions

contemplated in *Milivojevich*, a litigant must at least assert a secular purpose to the insidious activity. Since the alleged acts of defendants are undeniably matters of church administration that do not, and are not alleged to, serve a secular purpose, the fraud and collusion exceptions do not apply to these allegations.

Because (1) it appears that any fraud or collusion exception in Virginia could only apply in a hierarchical church context, and (2) because it appears that, even if a fraud and collusion exception applied to a congregational church, no extraordinary circumstances exist justifying court adjudication, and (3) because it appears that, even if a fraud and collusion exception applied to a congregational church, plaintiff has failed to allege defendants acted in bad faith for a secular purpose, this Court concludes that plaintiff has not asserted, and cannot assert, facts that would create a fraud or collusion exception that could provide this Court with subject matter jurisdiction. However, this does not end the Court's inquiry. The Court must still determine whether the "neutral principles" doctrine provides a separate avenue for adjudication of plaintiff's claim.

## B. Neutral Principles

Despite the general principle of judicial deference to church decisions, litigants continue to assert that courts should exercise jurisdiction over a variety of disputes, claiming that, even if the fraud and collusion exceptions are not applicable, "neutral principles" of law can still be applied to such disputes, thereby making federal and state courts appropriate forums for adjudication. As noted above, civil courts have routinely involved themselves in disputes over ownership of property if the decision can be made solely with reference to secular legal principles ("neutral principles" of law) and without deciding issues of religious doctrine. *See First Baptist Church of Glen Este v. Ohio*, 591 F. Supp. 676, 681 (S.D. Ohio 1983) (review of this principle in congregational church context). Although the United States Supreme Court has not approved the application of "neutral principles" of law to resolve non-property disputes and the Virginia Supreme Court has not squarely addressed the issue outside the ministerial context, other courts have applied "neutral principles" to adjudicate tort actions against religious defendants. Idleman, *supra* at 260, n. 118 (thorough discussion and cases collected). The Virginia Supreme Court, in *Reid*, applied neutral principles of secular law to address an ongoing factional dispute that essentially involved control of church property among other things. However, *Reid* did not

involve any tort-based claims by a minister against church members, as here. Therefore, this Court must still determine whether neutral principles of secular law can be applied here to adjudicate tort-based claims arising in part from alleged procedural irregularities in conducting a church's congregational meeting. A review of the case law in this area reveals that there are different views regarding the manner in which courts approach the application of "neutral principles" to alleged procedural defects in congregational church meetings. For example, the court, in *First Baptist Church of Glen Este*, 591 F. Supp. at 681, observed that:

> With respect to congregational church disciplinary matters, the courts have frequently been called upon to decide cases involving allegations of procedural defects in the conduct of the local church meeting at which the decision on the disputed matter was made. *See* Ellman, *Driven from the Tribunal: Judicial Resolution of Internal Church Disputes*, 69 Calif. L. Rev. 1378, 1381 (1981). Some courts have taken an "activist" view, insuring that the congregation has followed established procedures in disciplinary proceedings. According to this view, there is no reason to treat independent religious organizations any differently than other nonprofit voluntary associations. *See Baugh v. Thomas*, 56 N.J. 203, 265 A.2d 675 (N.J. 1970). Other courts have adopted a much more restrictive view, holding that they are "compelled by the First Amendment to avoid adjudicating the issue of whether [a dissident member's] expulsion was in accordance with [church governing documents]. . . ." *Nunn v. Black*, 506 F. Supp. 444 (W.D. Va.), *aff'd mem.*, 661 F.2d 925 (4th Cir. 1981), *cert. denied*, 454 U.S. 1146, 102 S. Ct. 1008, 71 L. Ed. 2d 299 (1982). *See also Simpson v. Wells Lamont Corp.*, 494 F.2d 490 (5th Cir. 1974).

Accordingly, this Court must determine whether the present tort-based dispute, asserting some procedural defects, can be resolved utilizing "neutral principles" of law.

### 1. Nunn

In *Nunn v. Black*, 506 F. Supp. 444, 445 (W.D. Va. 1981), *cert. denied*, 454 U.S. 1146 (1982), the court considered a congregational church dispute where "dissident members of the Church of God of

Prophecy in Collinsville, Virginia . . . assert[ed] [under 42 U.S.C. § 1983] that they were unlawfully expelled from church membership at a congregational meeting and that they were later arrested for trespassing after having been warned to stay off the property." The "plaintiffs allege[d] . . . a dispute arose between the defendants and the plaintiffs concerning the authenticity of the plaintiffs' 'glossolalia,' or speaking of tongues." *Id.* Notably, the plaintiffs asserted "procedural improprieties" regarding their expulsion, including that those who voted to expel the dissident members were not properly qualified to do so and that unanimous consent was required but not gained. *Id.* at 445-46. In addition to other legal theories, the plaintiffs claimed they were denied their "beneficial interest in the Church [property] without due process of law," and for which property "they had contributed considerable sums of money to the construction, maintenance, and upkeep. . . ." *Id.* at 446. The defendants moved the court to dismiss the action, "contend[ing] that State and Federal Courts have traditionally refused to become involved in doctrinal disputes and have refused to subject ecclesiastical matters similar to the present controversy to judicial inquiry." *Id.*

In dismissing the suit, the *Nunn* court cited *Simpson v. Wells Lamont Corp.*, 494 F.2d 490 (5th Cir. 1974), which considered an action brought by a discharged pastor and "narrowly defin[ed] the instances where the court's intrusion into ecclesiastical matters is warranted," stating:

> Only on rare occasions where there existed a compelling governmental interest in the regulation of public health, safety, and general welfare have the courts ventured into this protected (ecclesiastical) area. Such incursions have been cautiously made so as not to interfere with the doctrinal beliefs and internal decisions of the religious society.

*Nunn*, 506 F. Supp. at 447 (citing *Simpson*, 494 F.2d at 493). The Court in *Nunn* seized upon the reasoning in *Simpson*, concluding that, while the court's assessment may primarily involve consideration of the procedural rules of the church, "[i]t is clear from the *Simpson* analysis that *both procedural-governance questions* and doctrinal disputes are constitutionally removed from this court's review." *Id.* at 448 (citing *Simpson*, 494 F.2d at 493) (emphasis added). The court in *Nunn* further noted that the dissident members impliedly consented to be bound by the decisions of the church and concluded that "the fact the local church may have departed arbitrarily from its established expulsion procedures in

removing the plaintiffs is of no constitutional consequence . . . as ecclesiastical decisions are accepted as articles of faith." *Id.* at 448. Lastly, the court stated, "the above conclusion is not varied by the fact that the Church of God of Prophecy has no structured decision-making process." *Id. Nunn* is particularly relevant to the present case as it involves a church with a less structured "decision-making process" than employed by the Cradock Baptist Church; it regards allegations of procedural impropriety in dismissing several members of the church; and it cites as its primary authority a case where a discharged minister was suing the church.

## 2. Reid

The discussion above regarding the holding in *Nunn* brings us back to the Virginia Supreme Court's holding in *Reid*. While, at first blush, these two decisions might appear irreconcilable, a closer look reveals that they can be reconciled.[8] One might initially be surprised that the Virginia Supreme Court did not discuss *Nunn* in its *Reid* opinion, but the absence of such discussion is not that surprising considering the fact that, in *Nunn*, the plaintiffs, ousted church members, sought monetary damages and an injunction to restrain other members from instituting a criminal action for trespass against them. *Nunn*, 506 F. Supp. at 46. On the other hand, in *Reid*, church members filed a petition to enjoin a special commissioner, previously appointed without objection by such members, who chose not to attend the hearing, from interfering with their planned congregational meeting where *property ownership* would be affected. *Reid*, 229 Va. at

---

[8] This Court does not dispute that the *Reid* decision is more like the decisions from the first group of courts referenced in the quote above from *First Baptist Church Glen Este*, 591 F. Supp. at 681, the so-called "activist" view, and that *Nunn* is more like the decisions of the latter group of courts referenced in *First Baptist Church Glen Este*, the so-called "restrictive" view. However, even if the *Reid* and *Nunn* decisions were irreconcilable, the Court notes that "[a]s the state courts are not 'lower courts,' they are not required to follow the interpretation of lower federal courts, such as the Court of Appeals with jurisdiction over their state territory, even on matters relating to the Constitution of the United States." Nowak, Rotunda & Young, *supra*, ch. 1, § III; *see also Lockhart v. Fretwell*, 506 U.S. 364, 376 (1993) (Thomas, J., concurring); *Steffel v. Thompson*, 415 U.S. 452, 482 (1974) (Rehnquist, J., and Burger, J., concurring); *Ohio v. Burnett*, 93 Ohio St. 3d 419, 422, 755 N.E.2d 857, 860 (2001) (citing courts taking the opposite position). Therefore, even if *Nunn* and *Reid* were irreconcilable, this Court is required to follow the controlling decisions of the Virginia Supreme Court.

185. Therefore, *Reid* involved a neutral principles property dispute under extraordinary circumstances, whereas *Nunn* did not.

We now turn our attention to the facts presently before this Court and the question of whether neutral principles of law can be applied to decide this tort-based dispute grounded, in part, on alleged procedural defects. We begin this analysis with the *Reid* decision and observe that the circumstances in *Reid* are distinct both in kind and degree from the dispute presently before this Court. For example, as the *Reid* Court noted, "[t]his appeal is an outgrowth of a protracted and complex dispute between two factions in the membership of a congregational church. Both factions, at various times, resorted to the courts." *Id.* at 181. On the other hand, with Dr. Denny's claims, no "factions" have been alleged to exist, and the defendants have not sought the court's intervention. Indeed, the events alleged by Denny took place four years ago. Second, in *Reid*, the church involved, a "large independent congregational church in the City of Norfolk," had "no written constitution or by-laws and ha[d] traditionally been governed by majority vote of its members present and voting at annual congregational meetings." *Id.* Cradock Baptist Church has adopted both a church constitution and by-laws to govern its affairs, though they do not specifically provide for the procedure to terminate a minister. However, Article V, Sec. 2, of the church constitution provides that the pastor is called to serve until the relationship is dissolved at the request of either the pastor or the church, and plaintiff has admitted he was an employee at-will. Plaintiff has also admitted that he received a letter dated October 24, 2001, notifying him of a congregational vote to terminate him and providing him more than thirty days notice of such action, with an effective date of November 30, 2001. The letter also reflects that the meeting resulted in a vote to terminate plaintiff as pastor, and plaintiff alludes to this outcome in paragraph eighteen of his motion for judgment. Third, in *Reid*, multiple court orders were ignored throughout the dispute, creating an extraordinary situation. There have been no prior proceedings in the civil courts regarding this plaintiff's allegations. Fourth, and particularly significant, in *Reid*, "the right, title, and control of all property held in trust for the congregation" was central to the controversy before the court. *Id.*. at 182, 184, 187-88. Plaintiff Denny, on the other hand, asserts no allegations regarding church property rights. Additionally, the money damages that Denny seeks are merely incidental to the church's decision of who will act as its religious leader. Fifth, this matter comes to the Court as an action at law, whereas the trial court in *Reid* was acting in equity and therefore had greater powers to protect the civil and property

rights of those seeking its jurisdiction. Regarding Denny's dispute, a specific claim of tortious interference with contract expectancy has been asserted, limiting the Court's review to the elements of that tort. Specifically, for the Court to conclude that Denny has suffered a loss to his financial expectancy would require the Court to determine the future duration and capacity of Denny's divine calling to pastor the Cradock Baptist Church. To do so, would absolutely necessitate the Court to inquire into ecclesiastical affairs. Therefore, the holdings in *Reid* and *Nunn* suggest that this Court could not apply neutral principles of secular law to adjudicate a tort-based dispute that rested, in part, on alleged procedural irregularities because such adjudication would inhibit the First Amendment free exercise rights of defendants and excessively entangle this Court in ecclesiastical affairs.

### 3. Cha

Even if this Court were to broadly interpret *Reid* as permitting the Court to adjudicate a tort-based dispute that rested, in part, on alleged procedural irregularities, the Virginia Supreme Court's decision in *Cha* appears to preclude this Court from adjudicating this dispute involving termination of a minister. *Cha*, in essence, recognizes a ministerial exception to the neutral principles doctrine. *Cha*, 262 Va. at 613. Although the decision of the circuit court in *Cha* identified that church as "hierarchical," *Jae-Woo Cha v. Korean Presbyterian Church*, 55 Va. Cir. 480, 482 (Fairfax 2000), the Virginia Supreme Court never identified the church polity as "hierarchical" or described different standards that might apply to hierarchical versus congregational churches. Therefore, a strong argument can be made that the form of church polity made no difference to the Virginia Supreme Court where the dispute involved removal of a pastor. As discussed above, this suggests the existence of a Virginia "ministerial exception" to judicial adjudication, *irrespective* of the form of polity involved.

In *Cha*, the plaintiff worked as a church pastor. He alleged that he had a contract of employment that could only be terminated for good cause and that the church wrongfully terminated him. He also asserted that various defendants holding positions within the church, tortiously interfered with his contract of employment with the church and defamed him. Without distinguishing between hierarchical and congregational church contexts, the Court observed that the "right to choose ministers without government restriction underlies the well-being of religious

community . . . for perpetuation of a church's existence may depend upon those whom it selects to preach its values, teach its message, and interpret its doctrines both to its own membership and to the world at large. Any attempt by government to restrict a church's free choice of its leaders thus constitutes a burden on the church's free exercise rights." *Id.* at 611 (quoting *Rayburn v. General Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1167-68 (1985)).

Like *Cha*, plaintiff here alleges that defendants tortiously interfered with his contract, making defamatory statements, and causing his termination. Plaintiff Denny concedes that his only cause of action is tortious interference with contract against individual defendants, not against the church. The *Cha* Court appears to have recognized a *per se* "ministerial exception" to secular court adjudication where a discharged minister files suit against a *church*. *Cha*, 262 Va. at 612, *see Minker v. Baltimore Ann. Conf. of United Methodists*, 894 F.2d 1354, 1356-57 (D.C. Cir. 1990). However, the claim here is against individual defendants, requiring this Court to consider the *Cha* Court's analysis in part B of its opinion dealing with claims against individual defendants, not the church. As the *Cha* Court noted, in order to prevail on a tortious interference with contract claim, plaintiff has to establish: (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. As the *Cha* Court also noted, where a plaintiff alleges an employment at-will contract, as plaintiff does here, "a plaintiff, in order to present a prima facie case of tortious interference, must allege and prove not only an intentional interference that caused the termination of the at-will contract, *but also that the defendant employed improper methods*." *Cha*, 262 Va. at 613 (emphasis added). It is particularly significant that, for those reasons, the Court then concluded that:

> had the circuit court exercised subject matter jurisdiction of the plaintiff's motion for judgment, the court would have become entangled in issues regarding the church's governance *as well as matters of faith and doctrine*. And, as we have already held, ecclesiastical decisions regarding the appointment and removal of pastors are generally beyond the jurisdiction of secular courts. Neither the federal Free Exercise Clause nor Article I,

§ 16, of the Constitution of Virginia *permits a circuit court to decide whether the plaintiff had a valid contractual relationship or business expectancy to serve as a pastor of the Korean Presbyterian Church.*

*Id.* (emphasis added). The Virginia Supreme Court's conclusion that the circuit court's examination of plaintiff's tortious interference claim would have constituted entanglement in matters of faith and doctrine is significant because it is a recognition that neutral principles of secular law cannot be applied to decide such a tortious interference claim. It seems that in doing so, the Court recognized a "ministerial exception" to "neutral principles" adjudication, where neutral principles of secular law cannot be applied to resolve the dispute. This might also be referred to as the "ministerial exception" to the neutral principles doctrine.[9]

Having apparently already recognized a *per se* ministerial exception to secular court adjudication of claims against churches by terminated ministers, the *Cha* Court went on to recognize a more limited "ministerial exception" to the "neutral principles" doctrine where the minister's claim is against individual church members. While the "ministerial exception" originated in the context of federal discrimination claims against churches,

---

[9] In the face of assertions that *Employment Division, Dep't of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), undermines the ministerial exception, such does not appear to be the case. *Petruska v. Gannon Univ.*, 350 F. Supp. 2d 666, 678 (W.D. Pa. 2004). *Smith* held that the Free Exercise Clause does not require the State of Oregon to permit an exception, based on the religious use of peyote, from the general criminal prohibition on the use of the drug. In so holding, the Court explained that "the right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes . . . conduct that his religion prescribes. . . ." *Smith*, 494 U.S. at 879. However, as numerous courts have recognized, whereas the *Smith* court's concern was that, if an individual's legal obligations were contingent upon religious beliefs those beliefs would allow each individual to become a law unto himself, the ministerial exception does not subvert this concern because it was not developed to provide protection to individuals who wish to observe a religious practice that contravenes a generally applicable law. "Rather, the exception only continues a long-standing tradition that churches are to be free from government interference in matters of church governance and administration." *Petruska*, 350 F. Supp. 2d at 678. Because the ministerial exception is based on this tradition, and not on constitutional strict scrutiny, the United States Supreme Court's rejection in *Smith* of the compelling interest test does not affect the continuing vitality of the ministerial exception. *See E.E.O.C. v. Roman Catholic Diocese of Raleigh, N.C.*, 213 F.3d 795, 800, n. * (4th Cir. 2000) (recognizing continued vitality of the ministerial exception after the Supreme Court's *Smith* decision).

courts have recognized that the "ministerial exception" reasoning applies to state law *tort* claims as well. *Werft v. Dester Southwest Annual Conf.*, 377 F.3d 1099, 1100, n. 1 (9th Cir. 2004); *Bollard v. California Prov. of the Soc'y of Jesus*, 196 F.3d 940, 950 (9th Cir. 1999) ("[j]ust as there is a ministerial exception to Title VII, there must also be a ministerial exception to *any state law cause of action that would otherwise impinge on the church's prerogative* to choose its ministers or to exercise its religious beliefs in the context of employing its ministers") (emphasis added); *Lewis v. Seventh Day Adventists Lake Region Conference*, 978 F.2d 940, 942 (6th Cir. 1992); *Natal v. Christian and Missionary Alliance*, 878 F.2d 1575, 1577 (1st Cir. 1989).

Although the *Cha* Court's recognition of a *per se* ministerial exception involved a claim by a minister against a church, its discussion of the precedent supporting that *per se* ministerial exception also informs this Court's consideration of Denny's claim against the individual defendants, just as it did in *Cha*. *Cha*, 262 Va. at 613. In *Cha*, the Virginia Supreme Court relied upon and agreed with *Rayburn v. General Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1167-68 (4th Cir. 1985), *cert. denied*, 478 U.S. 1020 (1986), for the proposition that "[a]ny attempt to restrict a church's free choice of its leaders thus constitutes a burden on the church's free exercise rights." *Rayburn* recognized this "ministerial exception" that applied to Title VII discrimination claims. *Cha*, 262 Va. at 611. The *Cha* Court went on to rely upon *Bell v. Presbyterian Church*, 126 F.3d 328, 331 (4th Cir. 1997), for the proposition that "decisions of religious entities about the appointment and removal of ministers and persons in other positions of similar theological significance are beyond the ken of civil courts." *Cha*, 262 Va. at 612. The *Bell* case did not involve a Title VII discrimination claim. Rather, it involved claims that defendants "interfered with his contract," . . . "interfered with his prospective advantage," and "wrongfully terminated him." *Bell*, 126 F.3d at 330. Therefore, it appear that the *Cha* Court adopted the "ministerial exception" recognized by the United States Court of Appeals for the Fourth Circuit in *Rayburn*, a Title VII case, and extended to a non-Title VII tort/contract-based context in *Bell*. Therefore, *even if* the neutral principles doctrine might otherwise permit a court to adjudicate a tort-based dispute resting, in part, on alleged procedural defects, the *Cha* Court recognized that, where such disputes involve termination of ministers, free exercise rights are implicated.

It bears mentioning that there is no duty on defendants to assert a religious basis for the challenged activities, because "the focus under the ministerial exception is on the action taken [by the employer], not possible

motives." *Petruska v. Gannon Univ.*, 350 F. Supp. 2d 666, 677-78 (W.D. Pa. 2004). As this Court noted above, the plaintiff bears the ultimate burden to establish this Court's jurisdiction. Indeed, "the exception precludes any inquiry whatsoever into the reasons behind a church's ministerial employment decision." *E.E.O.C. v. Roman Catholic Diocese of Raleigh, N.C.*, 213 F.3d 795, 802 (4th Cir. 2000).

In concluding that a limited ministerial exception to the "neutral principles" doctrine should be recognized as to the minister's claim against individual defendants, the *Cha* Court stated that, in order for the plaintiff to prevail, he would have to show "an intentional interference that caused the termination of the at-will contract" and "that the defendants employed improper methods." Therefore, in order for *this* Court to decide whether defendants intentionally interfered with plaintiff's contract and whether they employed "improper methods" in doing so, the court would have to hear evidence as to the *motivations* of defendants. Asking that question would entangle this Court in matters of faith and doctrine because a church lay leader's whole purpose for being involved in a church is grounded in his faith and belief. To question that faith requires the court to decide amongst alternative options arising from the church leaders' view of how their faith affects their leadership obligations. In other words, their faith is inextricably intertwined with their leadership obligations, decisions, and motivations. *Seefried v. Hummel*, 2005 Colo. App. LEXIS 1208, *17 (Colo. App. July 28, 2005) (noting that deciding plaintiff's intentional interference with business relationship claim would require a court to determine whether defendants intentionally interfered with plaintiff's contractual relationship with a church and such inquiries would necessarily insert a civil court into the basis for the church's choice of religious leaders).

In a particularly succinct, persuasive, and thorough opinion cited in *Cha* and discussing application of "neutral principles" of law to a hierarchical church dispute, the Sixth Circuit concluded in *Hutchinson*, 789 F.2d 392, as follows: "This is an action brought by appellant, an ordained Methodist minister, challenging his enforced retirement under Church disciplinary rules. . . . In his original complaint, appellant raised a number of grievances against defendants, including contentions that defendants had improperly applied provisions of *The Discipline of the United Methodist Church*, governing the appointment and placement of ministers and that defendants had misled and misguided various units of the denomination in bringing about his early retirement. He further alleged that defendants were guilty of 'fraudulent or collusive or arbitrary' action,

as well as defamation, intentional infliction of emotional distress, and breach of contract." *Id.* at 392. In assessing the contention that neutral principles should be applied to decide the case, the court found: "[T]he 'neutral principles' exception *to the usual rule of deference applies only to* cases involving disputes over church property. But this case does not involve a dispute over church property. The 'neutral principles' doctrine has never been extended to religious controversies in areas of church government, order, and discipline, nor should it be. The claim here relates to appellant's status and employment as a minister of the church. It *therefore concerns internal church discipline, faith, and organization, all* of which are governed by ecclesiastical rule, custom, and law. The neutral principles doctrine relating to church property is simply not applicable in the instant case." *Id.* at 396. The *Hutchinson* court recognized a ministerial exception. Additionally, respecting the ecclesiastical leadership decisions and the level of deference they command, the *Hutchinson* court cited *Simpson v. Wells Lamont Corp.*, 494 F.2d 490, 492 (5th Cir. 1986), which noted, "[t]his case involves the fundamental question of who will preach from the pulpit of a church and who will occupy the church parsonage. The bare statement of the question should make obvious the lack of jurisdiction of a civil court. The answer to that question must come from the church." *Id.* at 394. Thus, amidst more egregious and legally profound allegations than presently before this Court, the court in *Hutchinson* found that neutral principles could not be applied to resolve the dispute and concluded subject matter jurisdiction did not exist, emphasizing the ideal of judicial restraint in such cases.

### 4. Membership Determination

In addition to having to determine whether the defendants employed "improper methods," there is yet another reason why this Court cannot apply "neutral principles" of law and recognize a "ministerial exception" for Denny's claims against defendants. Adjudication of Denny's claims would impermissibly require the Court to act as an arbiter of church doctrine such that "neutral principles" of secular law could not alone resolve the dispute. In his motion for judgment, Denny asserts that, when a congregational vote took place regarding his future employment, many "members present on that date were not active members of the congregation, however, they were allowed to cast a vote." The "Constitution and By-Laws of Cradock Baptist Church," which is before this Court, since defendants craved *oyer* of the document, contains an

Article III entitled "Membership." Section 1 of that Article III defines the membership of the church as follows: "[a]ll the members of this church shall consist of individuals who have confessed Jesus Christ publicly as Lord and Saviour and have followed Him in baptism." Section 2 goes on to describe how a professing believer in Jesus Christ must be interviewed to assure agreement with the aims and ideals of the church and how a vote of the church must be taken before the person can become a member. Section 2 also describes how a person transferring from another Southern Baptist Church becomes a member. Section 4 describes how members are removed from the church roll and specifically states that, "[i]f members prove inactive in attendance and contributions for a one-year period, they shall be placed on an inactive roll which shall be preserved in a recorded file." It goes on to state that members may be removed by a two-thirds vote for becoming "an offense to the church." Section 5 describes the duties of members, which include all those expressed in the New Testament of the Bible, regular attendance, and tithing. Article V provides for the election and duties of the pastor.

This recitation of requirements for members reveals that inquiring into plaintiff's assertion that some people who voted at the congregational meeting were not "active members" might require this Court to determine who was and was not an active member. Doing so might require the Court to, at a minimum, make determinations as to whether members had regular attendance and made contributions, and might even require the Court to determine whether the duties of the New Testament and tithing had been followed. Therefore, aside from all the other reasons noted above, to afford plaintiff the relief he requests risks entangling this Court with ecclesiastical doctrine. The mere determination of who is eligible to vote at the congregational meeting might "require[] ecclesiastical and not secular prowess." *In re Application of Congregation Yetev Lev D'Satmar, Inc.*, 2004 NY Slip. Op. 51515U, *13, 5 Misc. 3d 1023A, 2004 N.Y. Misc. LEXIS 246, ***34 (2004).

For all of these reasons, it is clear that this court cannot apply neutral principles to decide plaintiff Denny's claims against these individual defendants.

Had the plaintiff and his supporters come to this Court prior to their congregational meeting, it does not appear that *Reid* would have necessarily dictated a different outcome from that reached here. This Court might have acquired subject matter jurisdiction at that early juncture *if* neutral principles could have been applied to resolve the dispute. However, if the only issue had been termination of the pastor (and not a

property dispute), the ministerial exception would have applied and likely precluded adjudication. Furthermore, based upon plaintiff's assertion that the qualifications of church members to vote (because they were not "active members") was an issue at the time, it is unlikely this Court could have appointed a special commissioner to run the meeting since she would have been tasked with making a decision as to who were active members and that would likely take her into the thicket of making a doctrinal/faith decision. Had there been a factional dispute involving control of church property, as in *Reid*, the outcome might have been different.

### III. Conclusion

In light of the procedural history and legal precepts guiding the Court's reasoning, the Court reaches the following conclusions. Dr. Denny was employed by Cradock Baptist Church pursuant to an at-will employment contract as a pastor, a position qualifying as a minister under the abovementioned functional tests which inquire as to the religious nature of the position. Because this dispute involves the church's leadership decision as to who will direct the spiritual welfare of its congregation, extreme deference is owed to the actions of the church members named as defendants. The Court does not believe the allegations make out a cause of action under either the "fraud" or "collusion" exceptions, assuming their vitality, to the general principle of judicial restraint, as announced in *Milivojevich*, for all the reasons stated above. Moreover, while "neutral principles" have been employed to consider certain church property disputes, the application of these principles is not appropriate given the primarily ecclesiastical nature of the contentions, particularly considering the extreme deference owed by the courts to a church's selection of its clergy. Indeed, the Virginia Supreme Court has recognized a limited "ministerial exception" to the "neutral principles" doctrine, and it applies on the facts alleged here. In summary, plaintiff's case is dismissed for lack of subject matter jurisdiction. The briefs of the parties are ordered filed. Because of the Court's ruling, it is unnecessary to address the defendants' demurrer. Since the parties have stated their positions on the record, and/or in their pleadings, regarding the issue of subject matter jurisdiction and since there is a transcript of the May 13, 2005, hearing before this Court, the Court will dispense with the Va. Sup. Ct. R. 1:13 counsel endorsement requirement. It is so ordered.