# COURT OF APPEALS OF VIRGINIA

**Record No. 0185-25-4**

STEVE GASKINS, ET AL.

v.

MCLEAN BIBLE CHURCH

Present: Judges Friedman, Chaney and Duffan
Argued at Fredericksburg, Virginia

Opinion Issued May 19, 2026

## FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
David Bernhard, Judge[1]

Rick Boyer (Integrity Law Firm, PLLC, on briefs), for appellant.

Timothy Taylor (Brandon Elledge; Mark Churchill; Holland & Knight LLP, on brief), for appellee.

## PUBLISHED OPINION BY
## <u>JUDGE FRANK K. FRIEDMAN</u>

This case returns to us following our remand in *Gaskins, et al. v. McLean Bible Church*, No. 1074-22-4, 2023 Va. App. LEXIS 380 (June 13, 2023) (*Gaskins I*). Steve Gaskins, Roland Smith, Mike Manfredi, Kevin Elwell, and Adam Jeantet now challenge the circuit court's denial of their motion to compel discovery and its subsequent order granting summary judgment for McLean Bible Church ("MBC"). For the reasons below, we reverse the circuit court's judgment and remand for further proceedings.

---

[1] The Honorable David Bernhard presided over the proceedings below. Now a member of this Court, Judge Bernhard took no part in this decision.

BACKGROUND

Events Leading Up to *Gaskins I*

Gaskins, Smith, Manfredi, Elwell, and Jeantet ("the dissenters") are members of MBC, a nondenominational, congregational church in Vienna, Virginia.[2] MBC has a constitution that governs, as relevant here, the requirements of church membership and the procedures for electing MBC's "ruling body," the Board of Elders ("the Board").

According to the MBC constitution, any active member who is at least 16 years old may vote. Inactive members are those members who have not attended church services for eight consecutive weeks "without reasonable excuse." Inactive members may not vote or hold office.

Before seeking election to the Board, one must be nominated by an active MBC member. A six-member nominating committee appointed by the Board then considers whether each nominee meets the qualifications to be an elder. The Board separately considers the qualifications of each nominee approved by the nominating committee and submits to the congregation a list of final nominees at least two weeks before the June meeting.

Any nominee receiving 75% or more of the votes cast at the June meeting becomes a member of the Board. If fewer than six of the nominees exceed 75% of the vote, the Board "shall submit additional nominations to the congregation for approval within ninety (90) days," and the Board "shall be required to convene a congregational meeting and request a vote of confidence" should the new slate of elders also fail to receive at least 75% of the vote. Should

---

[2] Unlike hierarchical churches, which are subject to external control (e.g., a regional diocese) and often "establish internal tribunals to decide internal disputes," congregational churches are independent and "are governed by the will of the majority." *Reid v. Gholson*, 229 Va. 179, 188-89 (1985). "They are free to adopt constitutions, by-laws, and internal rules which will alter or regulate their proceedings, but even these must be enacted by majority vote. And in the absence of such voluntarily-adopted rules, each such congregation functions as a pure democracy." *Id.* at 189.

the Board not receive at least 75% of the confidence vote, the congregation selects a new nominating committee to nominate a new Board for congregational approval.

The controversy here involves the June 2021 Board election and its aftermath. Although it determined that many nominees were qualified to serve as elders, the Board "submitted only three handpicked candidates" at the June 2021 meeting. According to the operative second amended complaint, the Board sought to steal the election. The complaint alleges that, despite having "no practical means to determine that a member has missed eight consecutive weeks" amid the suspension of in-person worship services due to COVID-19, the Board "purge[d] members by designating them 'inactive' on an arbitrary basis, with no record that the members had missed eight consecutive Sundays, and without investigation into whether the members had 'reasonable excuse.'" The Board also "required a large number of members to cast 'provisional' ballots" at the June 2021 election. The Board did so, the complaint claimed, "with the sole intent of predetermining the outcome of the election." Despite their efforts to change the outcome of the election, the Board's nominees failed to obtain the requisite 75% of the vote at the June election.

Rather than submit "additional nominations," the Board nominated the same three candidates for a vote in July 2021 and announced that members would no longer be permitted to vote by secret ballot.[3] This time, the Board's nominees exceeded 75% of the vote and joined the Board.

The dissenters filed suit, alleging that the constitution was a contract between MBC and its members and that MBC breached that contract by denying some of its members the voting

---

[3] Secret ballots are not required by the MBC constitution, but the record suggests that they were the custom until the July 2021 vote.

rights to which they were entitled.[4] The dissenters requested injunctive relief: (1) ordering the Board to conduct all future elections by secret ballot; (2) declaring the 2021 election invalid and ordering a new election for the three elder positions; (3) ordering the Board to submit to a vote of confidence should the new nominees not receive 75% of the vote; (4) requiring the Board to allow any members on MBC's active roll as of March 1, 2020, to vote in the new election; (5) prohibiting voting by any members added to MBC membership rolls after the July 2021 election; (6) providing vote tabulations to the congregation; (7) appointing a special commissioner to oversee the election; and (8) disclosing to the congregation the names of all persons placed on inactive status or removed from the membership roll after January 1, 2021.

After about ten months of litigation, MBC crafted a "Plan for Lawsuit Resolution" establishing procedures for the June 2022 Board election. Under the plan, the three disputed 2021 elders would resign their positions and stand for reelection alongside three new nominees. The election would be conducted by secret ballot and any active member—including members who were on MBC's active roll as of March 1, 2020—would be allowed to vote provided they "before God still claim[ed] to be an active member of" MBC. If the nominees received under 75% of the vote, MBC pledged to follow the constitutional procedures, "including a vote of confidence contingency." MBC announced a special congregational meeting in May 2022 to vote on whether to approve the plan, "as well as voting on new members." Notifications of this meeting and the June meeting were sent by email to MBC's active membership database. There was some dispute about whether members deemed "inactive" received notice. The congregation

---

[4] "The constitution and by-laws adopted by a voluntary association constitute[] a contract between the members, which, if not immoral or contrary to public policy, or the law, will be enforced by the courts." *Gottlieb v. Econ. Stores, Inc.*, 199 Va. 848, 856 (1958) (quoting *Bradley v. Wilson*, 138 Va. 605, 612 (1924)).

approved the plan at the May meeting with over 84% of the vote. All six elder nominees received over 75% of the vote at the June 2022 meeting.

Following the June 2022 election, MBC filed a plea in bar asserting that the case was now moot. MBC attached to their plea in bar a copy of the plan and a chart showing the results of the June 2022 election. MBC's chart indicated that all six nominees would have received over 75% of the vote even if all new members who had been admitted in May 2022 had been excluded and assuming that all such members had voted to approve the nominees.

The circuit court held a hearing on MBC's plea in bar at which the dissenters conceded that the contested elders had resigned and been reelected. Neither side presented evidence at the hearing. After argument, the circuit court found that the case was moot but did not make any specific findings. It entered a one-page order granting MBC's plea in bar and dismissing the entire case with prejudice. The dissenters then appealed to this Court.

*Gaskins I*

In *Gaskins I*, we affirmed in part, reversed in part, and remanded the case for further proceedings. Reasoning that "[t]he 'time machine' remedy sought by appellants of reconstructing the 2021 voter universe and holding a new 2021 election is simply not feasible," we affirmed the circuit court's ruling that with respect to the dissenters' "desire to institute a reformulated 2021 election, the relief is unavailable and the request is moot." *Gaskins I*, slip op. at 8-9. We also made clear that the dissenters' "demand that the Board submit to a vote of confidence if the 'do over' election did not yield favorable results would also be moot." *Id.* at 9 n.8.

We disagreed, however, with the circuit court's ruling—and MBC's contention—that the entire case was moot. *Id.* at 9. After all, some of the dissenters' claims alleged ongoing violations of the MBC constitution. *Id.* at 10. Thus, we remanded the case "to permit the circuit

- 5 -

court to address ongoing claims relating to disenfranchisement of members, transparency and notice, and the secret ballot dispute." *Id.* at 12. We took care, though, not to express any opinion about the merits of the dissenters' remaining claims, holding only that they were not moot because they were not specifically tied to the 2021 elections. *Id.* at 10 n.10.

Events Following *Gaskins I*

A few things happened after this Court remanded the case in June 2023. First, MBC amended its constitution. The amended constitution eliminated the "vote of confidence" procedure, giving the Board more control over the election of new Elders. The allegedly disenfranchised members were, however, given neither notice of the vote nor the opportunity to vote on the proposed constitution.[5]

Second, the dissenters served MBC with discovery requests, many of which centered on the 2021 elections. As relevant here, the dissenters asked for (1) MBC membership lists from a few different points in time; (2) lists of those who were reclassified from active to inactive membership, or who were removed as members altogether, between March 1, 2020, and July 21, 2023; (3) minutes of all meetings of the Board of Elders "and/or any meetings of pastoral staff" between December 1, 2020, and July 21, 2023; and (4) explanations for the reclassification or removal of members.

MBC objected to most of these requests, citing the religion clauses of the U.S. and Virginia Constitutions, this Court's ruling in *Gaskins I*, and Virginia's civil discovery rules. MBC did, however, agree to produce documents pertaining to the five specific dissenters.

After some discussion between the parties about narrowing the scope of discovery, the dissenters moved to compel discovery. The circuit court—confronted with several novel

---

[5] The amended constitution is not directly at issue in this discovery dispute, so we do not address it further.

issues—ordered supplemental briefing and held a hearing on the matter. During this hearing, the dissenters conceded that without the requested information about how many people were reclassified as inactive, their "case goes away." Ultimately, the court denied the dissenters' motion to compel, holding that the court "lack[ed] authority to compel Defendants to produce their membership lists, minutes of internal deliberations or internal procedures applied to [anyone] other than the specific Plaintiffs in this cause." In reaching this conclusion, the court relied mainly on precedent concerning the First Amendment's protections for freedom of religion and freedom of association.[6]

After another round of supplemental briefing and another hearing, the circuit court granted MBC's motion for summary judgment, denied the dissenters' motion for partial summary judgment, and dismissed the case with prejudice. In its final order, the court explained that any further adjudication of the dissenters' claims would violate MBC's First Amendment rights. This appeal followed.

ANALYSIS

I. Standard of Review

We review a lower court's ruling on a motion to compel discovery under an abuse of discretion standard. *Patel v. Rabinowitz ex rel. Lakhani Assocs., LLC*, 75 Va. App. 663, 669-70 (2022). "However, '[a circuit] court by definition abuses its discretion when it makes an error of law. . . . The abuse-of-discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions.'" *Porter v. Commonwealth*, 276 Va. 203, 260 (2008)

---

[6] Because the dissenters conceded that their case could not proceed without the requested information, the court certified the matter for interlocutory appeal. But because the certification order stated that "the permissible scope of discovery *may be potentially* dispositive of whether Plaintiffs can proceed with most of the claims in their suit," (emphasis added), this Court denied the petition for interlocutory appeal. *See* Code § 8.01-675.5(A)(iii) (requiring that the determination of issues certified for interlocutory appeal "be dispositive of a material aspect of the proceeding currently pending before the court").

- 7 -

(alterations in original) (quoting *Koon v. United States*, 518 U.S. 81, 100 (1996)). Thus, any purely legal questions are subject to de novo review on appeal. *Patel*, 75 Va. App. at 670; *Michels v. Commonwealth*, 47 Va. App. 461, 465 (2006).

II. Civil Discovery Rules

The focal point of this appeal is the reach of discovery in an intra-congregational dispute. Rule 4:1(b)(1) of the Rules of the Supreme Court of Virginia provides that "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party." The dissenters argue that the discovery sought below relates to claims that MBC wronged them, in part, by disenfranchising like-minded congregants. This, in turn, worked to marginalize and silence the dissenters. MBC counters that only actions taken against the named parties can be relevant in this setting. MBC's view of discovery here is too narrow.

In *Oppenheimer Fund v. Sanders*, 437 U.S. 340 (1978), the U.S. Supreme Court interpreted Rule 26(b)(1) of the Federal Rules of Civil Procedure, which defines the general scope of civil discovery in federal cases. Although it has since been revised, Rule 26(b)(1) was, in 1978, identical to our current Rule 4:1(b)(1). The Court explained there that:

> The key phrase in [the] definition [of the scope of discovery]—
> "relevant to the subject matter involved in the pending action"—
> has been construed broadly to encompass any matter that bears on,
> or that reasonably could lead to other matter that could bear on,
> any issue that is or may be in the case. Consistently with the
> notice-pleading system established by the Rules, discovery is not
> limited to issues raised by the pleadings, for discovery itself is
> designed to help define and clarify the issues. Nor is discovery
> limited to the merits of a case, for a variety of fact-oriented issues
> may arise during litigation that are not related to the merits.

*Oppenheimer Fund*, 437 U.S. at 351 (citations omitted); *see Rakes v. Fulcher*, 210 Va. 542, 545-46 (1970) (relying on federal cases interpreting a Federal Rule of Civil Procedure that was

"substantially the same" as its Virginia counterpart). The Court cautioned, however, that "discovery, like all matters of procedure, has ultimate and necessary boundaries." *Oppenheimer Fund*, 437 U.S. at 351 (quoting *Hickman v. Taylor*, 329 U.S. 495, 501 (1947)). And it noted that "it is proper to deny discovery of matter that is relevant only to claims or defenses that have been stricken." *Id.* at 352.

The threshold question here is whether the materials and information sought by the dissenters in discovery are "relevant to the subject matter involved in the pending action." Rule 4:1(b)(1). The answer is yes. The membership lists, explanations for reclassification of members, and minutes of Board meetings are plainly relevant to the dissenters' claims regarding ongoing disenfranchisement of members who do not adhere to the Board's views—one of the three categories of claims that we said were not moot in *Gaskins I*.

That said, neither this Court nor the circuit court has decided whether the dissenters can obtain injunctive relief re-enfranchising anyone but themselves.[7] MBC represents that it "produced documents pertaining to the five appellants," so the remaining discovery the dissenters seek (i.e., documents and information about other disenfranchised members) would perhaps be less relevant to their claims if the universe of their potential remedies is restricted to those affecting only themselves. But save a few offhand remarks about class actions in MBC's First Amendment analysis, neither party has briefed this issue, and we decline to raise it sua sponte. Moreover, even putting aside the question of representative capacity, the requested discovery materials still relate to the dissenters' claims. Membership lists and explanations for

---

[7] During the hearing on the dissenters' motion to compel, the circuit court pointed out that "this is not a class action suit." And in its order denying the dissenters' motion, it observed that *Gaskins I* "does not clothe Plaintiffs with a representative capacity of other members, there being no class-action authority in Virginia with respect to this suit." Ultimately, though, in denying the dissenters' motion to compel discovery, the court relied exclusively on "precedent cited in [MBC's supplemental brief]," all of which dealt with First Amendment issues.

the alleged mass purge of dissenting members in 2021, for instance, could bolster—or could reasonably "lead to the discovery of admissible evidence" that would bolster—the dissenters' claim that MBC "intentionally dilute[d] the voting strength of Plaintiffs and their fellow dissenting voices, by arbitrarily and unconstitutionally denying voting rights to members in the dissenting faction, thus injuring all Plaintiffs." *See* Rule 4:1(b)(1).

Because the material sought in discovery is sufficiently "relevant to the subject matter involved in the pending action," the next question is whether it is "privileged." Rule 4:1(b)(1). MBC argues—and the circuit court agreed—that the information is privileged under the First Amendment's protections for associational and religious rights. At this stage of the proceedings, we disagree with the circuit court's conclusion that the discovery was impermissible.

III. Freedom of Association[8]

In its final order granting MBC summary judgment, the circuit court wrote the following:

> In contemplation of the caselaw identified by Defendant, the First Amendment right to freedom of association bars discovery of the information sought as it necessitates disclosure of the names of members, officers and employees of Defendant, discretionary decision-making, and deliberation, inquiry into which may involve compelling disclosure of faith-based considerations.
>
> The First Amendment right of freedom of association of the United States Constitution bars the trial court from compelling Defendant, a religious entity, to disclose its private membership lists and internal leadership deliberations in a non-class-action lawsuit brought by five plaintiff members of a dissenting faction, respecting the alleged violations of the right of members to participate in the religious entity's proceedings.

---

[8] *See, e.g.*, *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984) (stating that the U.S. Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others").

In their opening brief, the dissenters argue that the circuit court erroneously considered the First Amendment's freedom of association to be a "jurisdictional bar to discovery," rather than a qualified privilege subject to a balancing test. We agree.

A.  MBC's Reliance on Discovery Cases Involving State Action is Flawed Here

To begin, there are no Virginia cases in which a defendant organization has invoked its First Amendment freedom of association as a privilege against disclosure after a private (i.e., non-government) plaintiff requested a membership list in discovery. So we look to federal cases for guidance.[9]

U.S. Supreme Court precedent reflects a consistent skepticism toward compulsory disclosure of membership lists. *See, e.g.*, *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958); *Bates v. City of Little Rock*, 361 U.S. 516, 523 (1960); *Buckley v. Valeo*, 424 U.S. 1, 64 (1976) (per curiam); *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021). But besides reinforcing the basic idea that the First Amendment includes a freedom of association, these cases offer little guidance here. That is because they (and many of the other federal cases MBC cites) all deal with *state* action—government-mandated disclosure requirements. And the Court in *Bonta* made crystal clear that the "exacting scrutiny" standard applied in these cases is only "triggered by 'state action.'" *Bonta*, 594 U.S. at 616 (quoting *NAACP*, 357 U.S. at 460); *see also Marshall v. Bramer*, 828 F.2d 355, 360 (6th Cir. 1987) (distinguishing between cases in which "the government seek[s] to obtain and publicize a list of names" and those in which "a private litigant seek[s] to view a list for the purpose of deposing individuals who may have relevant information").

---

[9] *See Toghill v. Commonwealth*, 289 Va. 220, 227 (2015) (explaining that federal cases are persuasive authority, not binding precedent).

Here, there is no state involvement—these are two private parties—so MBC's reliance on this line of cases is misplaced.  After all, the "exacting scrutiny" standard that MBC urges us to apply requires, among other things, the identification of a "sufficiently important *governmental* interest."  *Bonta*, 594 U.S. at 631 (emphasis added).  The government has no interest in this private lawsuit, so, simply put, MBC's argument on this point is unpersuasive.

B. Courts Have Consistently Relied Upon Balancing Tests to Resolve this Type of Right-of-Association Discovery Dispute

The dissenters argue that the circuit court should have applied the balancing test set forth in *Grandbouche v. Clancy*, 825 F.2d 1463 (10th Cir. 1987), in which the Tenth Circuit explained that "[a]lthough the First Amendment does not normally restrict the actions of purely private individuals, the amendment may be applicable in the context of discovery orders, even if all of the litigants are private entities."  *Id.* at 1466.  The court advised that trial courts should consider the following factors before ordering disclosure: "(1) the relevance of the evidence; (2) the necessity of receiving the information sought; (3) whether the information is available from other sources; and (4) the nature of the information.  The trial court must also determine the validity of the claimed First Amendment privilege."  *Id.* (citation omitted).  And because it was the plaintiff in *Grandbouche* who raised the First Amendment privilege in response to the defendant's discovery requests, the court said that the trial court should also consider the fact that the plaintiff "placed certain information into issue" by filing his complaint.  *Id.* at 1467.

*Grandbouche* is, of course, not binding on this court, nor have all federal courts applied it uniformly in similar cases.  *See, e.g.*, *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160-61 (9th Cir. 2010) (outlining a burden-shifting framework and requiring the party asserting the privilege to make a "prima facie showing of arguable [F]irst [A]mendment infringement"); *Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am., et al. v. Nat'l Right to Work Legal Def. and Educ. Found., Inc.*, 590 F.2d 1139, 1152 (D.C. Cir. 1978) (identifying factors

- 12 -

similar, but not identical, to those in *Grandbouche*); *In re Motor Fuel Temperature Sales Prac. Litig.*, 707 F. Supp. 2d 1145, 1152-53 (D. Kan. 2010) (combining *Perry*'s burden-shifting framework and prima facie showing requirement with the *Grandbouche* balancing test). But the main takeaway is this: all courts that have dealt with these sorts of cases have applied *some* kind of balancing test. Consequently, the circuit court here erred in finding that the "First Amendment right to freedom of association *bars* discovery of the information sought." (emphasis added). And in applying the wrong standard, the court made a legal error, thereby abusing its discretion. *Porter*, 276 Va. at 260.

      C. The Framework on Remand

Mindful that "[l]iberal discovery is provided for the sole purpose of assisting in the preparation and trial, or the settlement, of litigated disputes," *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34 (1984), we follow the lead of the several federal district courts that have utilized a burden-shifting framework in like contexts. *See, e.g.*, *In re Motor Fuel Temperature Sales Prac. Litig.*, 707 F. Supp. 2d at 1152-53; *Christ Covenant Church v. Town of Sw. Ranches*, No. 07-60516-CIV, 2008 U.S. Dist. LEXIS 49483, at *16-23 (S.D. Fla. June 29, 2008); *Blankenship v. Fox News Network, LLC*, No. 2:19-cv-00236, 2020 U.S. Dist. LEXIS 162381, at *12-13 (S.D. W. Va. Sept. 4, 2020); *Better Path Coal. Plan Grp. v. City of Harrisburg*, No. 1:22-CV-00623, 2025 U.S. Dist. LEXIS 156081, at *41-43 (M.D. Pa. Aug. 13, 2025); *Tesla Motors, Inc. v. Johnson*, No. 1:16-cv-01158, 2018 U.S. Dist. LEXIS 228622, at *9 (W.D. Mich. June 6, 2018); *Willoughby v. Abbott Lab'ys*, No. 23-C-338, 2024 U.S. Dist. LEXIS 960, at *5-6 (N.D. Ill. Jan. 3, 2024). Under this framework, the party asserting a privilege based on the freedom of association must first make a prima facie showing that the claimed privilege applies. To make this showing, the litigant "must demonstrate an objectively reasonable probability that compelled disclosure will chill associational rights, i.e.[,] that disclosure will deter membership due to fears

- 13 -

of threats, harassment or reprisal from either government officials or private parties which may affect members' physical well-being, political activities or economic interests." *In re Motor Fuel Temperature Sales Prac. Litig.*, 707 F. Supp. 2d at 1153. If such a showing is made, then the burden shifts to the party seeking discovery to demonstrate a "compelling need for the requested information." *Id.* The trial court should then analyze the *Grandbouche* factors to determine whether such a compelling need exists. *Id.*

Because additional fact-finding is necessary to determine whether MBC has made a prima facie showing that the First Amendment associational privilege applies, we remand the case with instructions to apply the burden-shifting framework outlined above. *See Edwards v. Commonwealth*, 49 Va. App. 727, 741 (2007) (remanding the case because the trial court applied the wrong legal standard and had not made the "predicate factual findings" necessary to apply the correct standard); *Grandbouche*, 825 F.2d at 1467 (remanding for application of balancing test). To be clear, we express no opinion on whether MBC has made the requisite showing, nor whether the dissenters can demonstrate a compelling need for the requested information. Those are issues for the circuit court to decide. But we note that the court "may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Rule 4:1(c). "With this authority at hand, [the court] should not hesitate to exercise appropriate control over the discovery process." *Herbert v. Lando*, 441 U.S. 153, 177 (1979).[10]

---

[10] Indeed, the circuit court already granted a protective order in this case preventing the disclosure of confidential information.

- 14 -

IV.  Freedom of Religion

The freedom of association was not the only pillar of the First Amendment on which the circuit court rested its decision denying the dissenters' motion to compel discovery and granting MBC summary judgment.  The court also found that

> [t]he First Amendment right of freedom of association and Free Exercise and Establishment clauses of the United States Constitution bar compelling discovery of the internal documents and procedures employed by Defendant to determine compliance with Defendant's governing documents in pursuit of application of neutral principles of law, when as is the case here, such discovery poses a substantial risk of forcing disclosure of matters of religious faith or doctrine or of influencing Defendant's membership decisions.

For reasons stated below, that holding was premature.  In finding a "substantial risk of forcing disclosure of matters of religious faith or doctrine," the court applied an incorrect legal standard and erroneously overlooked its own discretion in fashioning appropriate limits on the scope of discovery.  *See* Rule 4:1(c).

A.  Ecclesiastical Abstention and Neutral Principles

    1.  Secular Courts Can Adjudicate Religious Disputes When They Arise from Neutral Principles of Law

Looming over this case is the question of whether we (or any other court for that matter) have subject matter jurisdiction.  "The constitutional guarantees of religious freedom have no deeper roots than in Virginia, where they originated, and nowhere have they been more scrupulously observed.  These principles prohibit the civil courts from resolving ecclesiastical disputes which depend upon inquiry into questions of faith or doctrine."  *Reid v. Gholson*, 229 Va. 179, 187 (1985).  "The threshold inquiry for a court asked to resolve [a church] dispute must be whether its resolution will project the fact-finder into what the Supreme Court . . . aptly called a 'religious thicket.'"  *Id.* (quoting *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 719 (1976)).  "But where church property and civil rights disputes can be decided without

- 15 -

reference to questions of faith and doctrine, there is no constitutional prohibition against their resolution by the civil courts." *Id.* at 187. "The question is simply whether the court can decide the case by reference to neutral principles of law, without reference to issues of faith and doctrine." *Id.* at 188; *see Episcopal Diocese of S. Va. v. Marshall*, 81 Va. App. 255, 271 (2024) (noting that a church property dispute can be resolved on the basis of, among other things, "the provisions in the constitution of the general church concerning the ownership and control of church property," as long as the court can apply "neutral principles of law").

As MBC correctly points out, the First Amendment's protections extend to one of the most fundamental religious matters of all: a church's membership decisions—its "selection of those who will personify its beliefs." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188 (2012). The U.S. Supreme Court has long recognized as much, opining in 1872 that it could not "decide who ought to be members of the church, nor whether the excommunicated have been justly or unjustly, regularly or irregularly cut off from the body of the church." *Watson v. Jones*, 80 U.S. 679, 730 (1872) (quoting *Shannon v. Frost*, 42 Ky. 253, 258 (1842)). And this principle is at its strongest when an ecclesiastical tribunal in a hierarchical church has made a decision: "the Constitution requires that civil courts accept [ecclesiastical tribunals'] decisions as binding upon them." *Milivojevich*, 426 U.S. at 725. Secular courts cannot even inquire into whether a hierarchical church has, through its chosen tribunal, "followed its own procedures." *Hosanna-Tabor*, 565 U.S. at 187; *see also Nunn v. Black*, 506 F. Supp. 444, 448 (W.D. Va. 1981) ("[I]t is clear that the fact that the local church may have departed arbitrarily from its established expulsion procedures in removing the plaintiffs is of no constitutional consequence . . . ."), *aff'd*, 661 F.2d 925 (4th Cir. 1981), *cert. denied*, 454 U.S. 1146 (1982).

But that is not necessarily the case when dealing with a *congregational* church. In *Reid*, our Supreme Court explained that although "the civil courts will treat a decision by a governing body or internal tribunal of a[] hierarchical church as an ecclesiastical determination constitutionally immune from judicial review," congregational churches are subject to different rules. 229 Va. at 189.

> When the majority has spoken in a fairly-conducted congregational meeting held after proper notice to the membership, then the governing body of the church has expressed its will and, as in the case of a[] hierarchical church, its decision is constitutionally immune from judicial review.
>
> The situation is otherwise, however, when the members of a congregational church merely seek the protection of the court for the purpose of obtaining a fairly-conducted meeting in the first place. Here the analogy to hierarchical churches breaks down because there is no body of ecclesiastical law to invoke, no internal tribunal to appeal to.

*Id.*; *see also Howard v. Heritage Fellowship Church*, 108 Va. Cir. 260, 264 (Fairfax Cnty. 2021) (finding subject matter jurisdiction where congregational church lacked internal tribunal to resolve conflicts and plaintiffs sought judicial review of church board's "compliance with its own Constitution and Bylaws"); *Ervin v. Lilydale Progressive Missionary Baptist Church*, 813 N.E.2d 1073, 1077 (Ill. App. Ct. 2004) (holding that the First Amendment does not prohibit court intervention when a congregational church "fails to follow the procedures it has, itself, enacted"). Thus, although this case involves membership decisions, we—and the members of MBC—are bound not by the Board's decisions, but by "the will of the majority," as expressed in the MBC constitution.[11] And courts are free to interpret and apply the relevant provisions of that

---

[11] MBC argues that because its constitution describes the Board as the "ruling body" of the church, "membership decisions made by the Board of Elders are the definitive decisions of the Church," and are thus unreviewable by secular courts. But such a holding would render meaningless the MBC constitution, and with it, the will of the majority of this congregational church. It would effectively allow the Board to insulate all its decisions from judicial review— even those plainly violative of the very constitution that grants it authority.

constitution just as long as they do so "in purely secular terms" and do not "rely on religious precepts." *Marshall*, 81 Va. App. at 271 (quoting *Jones v. Wolf*, 443 U.S. 595, 604 (1979)).

2. The Dispute Here, as Currently Framed, Hinges on Neutral Principles

The number eight is neutral. That is the number of consecutive weeks of worship services a member must miss before the Board may deem them inactive. If a member who has not missed eight consecutive weeks is declared inactive, the Board has violated the MBC constitution. And that is exactly what the dissenters allege happened here. This Court, and all other courts in Virginia, are surely able to count to eight without entering a "religious thicket."[12] *Milivojevich*, 426 U.S. at 719.

MBC counters that the eight-weeks inquiry is not, in fact, neutral because the eight weeks must be missed "without reasonable excuse." It argues that what constitutes a reasonable excuse is a purely ecclesiastical question, and thus one outside this Court's bailiwick (and its jurisdiction). It may be, of course, that the documents the dissenters seek in discovery reflect that all disenfranchised members missed eight consecutive weeks of worship services and that the Board determined that they did so "without reasonable excuse." In that case, this dispute would be at an end; no secular court could second-guess the Board's earnest opinion as to what

---

[12] Contrast this case with two Virginia circuit court cases revolving around disputes in congregational churches. In *Denny v. Prince*, 68 Va. Cir. 339, 372 (Portsmouth Cnty. 2005), the plaintiff alleged that non-active members of the church were allowed to vote at a congregational meeting about the future of his employment at the church. The court found that it lacked jurisdiction to decide who was a member of the church because under that church's constitution, membership was *expressly* tied to questions of faith: "all the members of this church shall consist of individuals who have confessed Jesus Christ publicly as Lord and Saviour and have followed Him in baptism." *Id.* at 372-73. And in *Smith v. Faith Baptist Church*, 108 Va. Cir. 544, 558 (Chesapeake Cnty. 2019), the church had no constitution or bylaws; it "used principles in the Bible for administration and governance of the Church." The court there held that it could not exercise jurisdiction because it would have to rely on biblical principles to determine who was a church member, properly entitled to vote in the disputed congregational meeting. *Id.* at 559. Here, though, we need not rely on biblical or religious principles—we can, at least at this stage in the litigation, rely solely on numerical principles.

constitutes a reasonable excuse. But until that happens, our courts retain jurisdiction. And it may also develop that no "reasonable excuses" were sought or tendered and that certain members of the congregation were simply trimmed from the voting lists to influence the outcome of elections. In sum, an assertion that a dispute *might* involve a purely religious question is quite different from an assertion that the dispute *will* turn on such a question. The latter is a good reason to apply the ecclesiastical abstention doctrine and short-circuit the litigation; the former is not.

### B. Civil Discovery and Religious Autonomy

MBC suggests that even if the ecclesiastical abstention doctrine does not apply, the "very process of inquiry" into these matters would infringe on the church's First Amendment rights. Once again, there is no Virginia case law squarely addressing this question. And other jurisdictions offer sharply conflicting views. *Compare McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*, 155 F.4th 415, 423 (5th Cir. 2025) (holding that the "very process of inquiry" into a church's internal affairs can "impinge on rights guaranteed by the [First Amendment]" (alteration in original)), *and Ellis v. Shaw*, 826 P.2d 978, 988-89 (Okla. 1992) ("Because religious judicature is immune from any civil court inquest, it is also protected from intrusion by discovery." (emphasis omitted)), *with Kirby v. Lexington Theological Seminary*, 426 S.W.3d 597, 619 (Ky. 2014) ("[E]xcessive entanglement may be a real possibility during the litigation but . . . the trial judge has adequate discretion to control discovery and the flow of evidence so that if ecclesiastical matters overtake the litigation, the case can be stopped on summary judgment or simply dismissed."), *and Zinski v. Liberty Univ., Inc.*, 761 F. Supp. 3d 916, 921 (W.D. Va. 2025) (noting that "some discovery may be important" to determine whether the plaintiff's termination was "intertwined with an ecclesiastical controversy").

- 19 -

We disagree with MBC and find nothing objectionable about allowing limited discovery to determine whether the ecclesiastical abstention doctrine applies. We opt for this less restrictive approach for three main reasons. First, "a court always has jurisdiction to determine whether it has subject matter jurisdiction." *Pure Presbyterian Church of Wash. v. Grace of God Presbyterian Church*, 296 Va. 42, 50 (2018) (quoting *Morrison v. Bestler*, 239 Va. 166, 170 (1990)). Second, a rule barring any inquiry into church governance, even just to determine whether the ecclesiastical abstention doctrine applies in the first place, could swallow the neutral-principles doctrine and present a great potential for abuse by religious entities endeavoring to shield their malfeasant employees from any secular ramifications. And third, the U.S. Supreme Court's decision in *Herbert v. Lando* provides a useful tiebreaker here: "Evidentiary privileges in litigation are not favored, and even those rooted in the Constitution must give way in proper circumstances." 441 U.S. at 175. "[Whatever] their origins, these exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth." *Id.* (quoting *United States v. Nixon*, 418 U.S. 683, 710 (1974)).

In ruling against MBC on this point, we embrace the perhaps subtle—but meaningful— distinction between a religious institution being "above the law" and being subject to the law while still wielding significant privileges and protections.

We recognize that the circuit court had little precedential guidance in deciding these weighty questions. Nevertheless, for all the reasons stated above, we find error in the circuit court's holding that the First Amendment's religion clauses flatly barred it from compelling any discovery. We therefore reverse the court's judgment. If, on remand, the court finds that the associational privilege does not apply, it should proceed with appropriately limited discovery to determine whether the ecclesiastical abstention doctrine applies. *See* Rule 4:1(c); *Dick Kelly*

*Enters. v. City of Norfolk*, 243 Va. 373, 383 (1992) ("The question whether to limit pre-trial discovery is a matter within the sound judicial discretion of the trial court.").

CONCLUSION

For the foregoing reasons, the circuit court's judgment is reversed and remanded with instructions to conduct the proper balancing test to determine whether the claimed First Amendment associational privilege applies. If the circuit court finds that this privilege does not apply, then it should proceed with tailored discovery to determine whether the ecclesiastical abstention doctrine applies.

We do not mean to make light of the significant religious and associational interests at play here. Again, religious freedom has deep roots in Virginia, and we continue to "scrupulously observe[]" its dictates. *Reid*, 229 Va. at 187. But until MBC demonstrates a genuine threat to, or a present infringement of, its First Amendment rights, the dissenters are entitled to pursue discovery and this case endures.

*Reversed and remanded.*